UNITED STATES of America

v.

Roberto RODRIGUEZ, a/k/a "Hacha," Nelson Garcia, a/k/a "Nelson Cabilla," Mirella Pacheco, John Doe, a/k/a "Manuelito," Juan Carrero, Earl Gardner, Noel Aguero, Manuel Carrillo, a/k/a "Luis Rosado," a/k/a "El Gordo," a/k/a "71," Jose Cots, a/k/a "Padrino," Rafael Flores, a/k/a "Fluffy," John Doe, a/k/a "Pucho," John Doe, a/k/a "El Negro," a/k/a "Jose Melendez," Nelson Noa, Ronnie L'Rue, Aurea Rodriguez, Maria Rodriguez, a/k/a "Maruca Rodriguez," Awilda Salcedo, Evaristo Valentin, a/k/a "Shorty," Pastor Cruz, Carmen Garcia, Manuela Pereyra, a/k/a "Abuela," and Avelino Espinoza, a/k/a "Cuba," Defendants.

89 Cr. 0576 (LLS).

United States District Court, S.D. New York.

April 3, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Nelson W. Cunningham and Amy E. Millard, Asst. U.S. Attys., of counsel), New York City, for U.S.

Howard Leader and David Cooper, New York City, for defendants.

## OPINION AND ORDER

STANTON, District Judge.

All 22 defendants are charged with participating from July 1988 to July 21, 1989 in a conspiracy to distribute more than 500 grams of cocaine and more than 50 grams of crack (count one). Defendant Roberto Rodriguez is charged with engaging in a continuing criminal enterprise (count two). He and defendant Manuela Pereyra are charged with distributing a half-kilogram

of cocaine on July 15, 1988 (count three). Pereyra is charged with distributing cocaine on three other occasions (counts four, five and six). Defendant Pastor Cruz is charged with distributing cocaine on three occasions (counts seven, eight and nine). He and defendant Carmen Garcia are charged with distributing 125 grams of cocaine on April 21, 1989 (count ten). Defendant Juan Carrero is charged with renting, leasing and making available apartments for the purpose of manufacturing, storing, distributing and using a controlled substance (counts 11, 12, 13 & 14). The government also seeks forfeiture of Roberto Rodriguez's property constituting, or derived from, the proceeds of his narcotics violations.

The defendants jointly move to suppress evidence obtained from wiretaps and to exclude reference to aliases in the indictment.[1] Defendants Manuel Carrillo, Nelson Noa and Nelson Garcia move to suppress physical evidence obtained from searches of their apartments. Garcia moves to dismiss the indictment against him for improper venue. Noa moves to exclude references at trial to the defendants' common Cuban heritage. Defendant Earl Garner moves to suppress evidence obtained from the wiretaps and to dismiss the indictment against him for prosecutorial misconduct and improper venue.

Because of the number of defendants, charges and motions, a short summary of the allegations against the defendants is helpful.

### 1. Summary of the allegations

According to the government:[2]

Roberto Rodriguez was the head of a large-scale drug organization that distributed cocaine and crack in the Bronx, New York (herein the "organization"). The organization operated a "retail outlet" at 769 Bryant Avenue in the Bronx, where it sold crack and cocaine. The retail outlet was open 24 hours a day, with employees working two twelve-hour shifts. At the end of each shift, money from the sale of drugs was transferred to a nearby "office", located at 1315 Lafayette Avenue, apartment # 1-E, in the Bronx (herein the "office"). Revenues often totalled as much as $30,000 per day. Records of receipts and outlays were kept at the office. Cocaine was stored in nearby "stash pads", and employees in the office called for more cocaine when needed.

Every day or two, Rodriguez drove from New Jersey to the office to pick up and take the cash proceeds to his headquarters at the Imperio Cafe, a restaurant he owned in West New York, New Jersey, where he directed the organization.

The organization also distributed cocaine through defendant Manuela Pereyra, who sold it from her apartment at 1204 Gilbert Avenue, in the Bronx.

The remaining defendants played various roles in the organization. Some were managers at the retail outlet, some were "cookers" (those who turn cocaine into crack by cooking it) some were couriers, some worked at the office, maintaining records and keeping Rodriguez apprised of the operation, and some were "steerers", directing purchasers to the retail outlet.

### 2. Pen registers and wiretaps

After receiving authorization from a magistrate in the Southern District of New York, the government installed pen registers[3] on telephones at the office, the resi-

---

**1.** The defendants have also moved: (1) to obtain discovery; (2) for a bill of particulars; and (3) for severance. The motions to obtain discovery and for a bill of particulars are dealt with in a separate order. The motions for severance, to the extent the government opposes them, are held in abeyance pending further submissions.

**2.** This summary is based on the affidavit of Drug Enforcement Agent Mark Hannan, submitted in support of the application for search

and arrest warrants (attached as exhibit 1 to affidavit of Nelson Cunningham, sworn to Feb. 27, 1990), and the affidavit of Drug Enforcement Agent Kenneth Bambach, submitted in support of the application for wiretaps (attached as exhibit 3 to the Cunningham affidavit).

**3.** A pen register is a device that records the telephone numbers dialed from a particular telephone. However, it does not overhear the communication and does not indicate whether

dences of Pastor Cruz and Manuela Pereyra (both in the Bronx) and the Imperio Cafe in New Jersey. Pen registers were installed with respect to four telephones at the Imperio Cafe: two private lines and two pay phones, one located in the bar section of the Cafe and one in the restaurant section. This was done in the following manner.

The DEA arranged with New Jersey Bell Telephone Company to lease a line running from near the Imperio Cafe in West New York, New Jersey to DEA headquarters at 555 West 57th Street, New York, New York. (Affidavit of DEA Agent Kenneth Bambach, sworn to Feb. 27, 1990, at ¶ 3, attached as exhibit 2 to the Cunningham affidavit). The pen registers were installed, monitored and used at DEA headquarters in New York. *Ibid.*

On June 21, 1989 the government applied to the Hon. Peter K. Leisure, a judge of the United States District Court for the Southern District of New York, for electronic surveillance of the telephones at the office and at the Imperio Cafe. The application was based on the affidavit of DEA Agent Kenneth Bambach, who stated:

> One of the telephones for which an order of interception is sought is located in the Bronx, within the Southern District of New York. The remaining four telephones are located in West New York, New Jersey. However, the interception equipment for these telephones, as for the first, will be installed at DEA headquarters in Manhattan, within the Southern District of New York. Further all five telephones will be monitored at DEA headquarters in Manhattan.

Judge Leisure granted the application.

> According to DEA Agent Bambach,
> Pursuant to his order, monitoring and recording equipment was installed on June 21, 1989 at DEA headquarters in a room set aside for the purpose ("the Monitoring Room"). The monitoring and recording equipment was installed in tandem with the pen register devices al-

ready installed on these telephones. As a practical matter, no action was necessary in New Jersey to commence the surveillance of the telephones; all actions were taken at DEA headquarters in Manhattan.

> 5. The monitored telephones were monitored by agents of the DEA and by Special Federal Officers in the Monitoring Room during the thirty days of the existence of Judge Leisure's order. Tape recording equipment maintained in the Monitoring Room recorded the monitored conversations, and the tape cassettes were maintained at DEA headquarters in Manhattan.

*Id.* at ¶¶ 4, 5.

On July 7, 1989 the government applied to the Hon. John W. Bissell, a judge of the United States District Court for the District of New Jersey, to tap the four telephone lines in New Jersey. Judge Bissell granted the application.

Defendants jointly move to suppress evidence obtained from the taps between June 21 and July 7, 1989, arguing that Judge Leisure lacked jurisdiction to order wiretaps on telephones located outside of the Southern District of New York. They also move to suppress all evidence obtained from the wiretaps, arguing that the affidavit of Agent Bambach failed to establish the need for wiretaps and the government failed to minimize the intercepted conversations.

Defendant Earl Garner moves to suppress all evidence obtained from the wiretaps, arguing that it is the fruit of illegally used pen registers. Garner states that the pen registers were illegal because a magistrate lacks authority to order them, and, in any event, the magistrate lacked jurisdiction to order pen registers on telephones located in New Jersey. He also claims that the evidence must be suppressed because the tapes of the communications intercepted were sealed by a magistrate, rather than by a judge, as required by law.

calls are actually completed. *See U.S. v. New York Tel. Co.,* 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366–67 n. 1, 54 L.Ed.2d 376 (1977).

### (a) *The wiretaps*

#### (i) Jurisdiction

■ The procedures for obtaining federal authorization of wiretapping and other forms of electronic surveillance are set forth in Chapter 119 of Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–2521. Section 2518(3) provides that a judge may enter an order "approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting...."

Defendants state that Judge Leisure lacked jurisdiction to authorize wiretapping of telephones located outside of his territorial jurisdiction. They make much of the argument that the claimed defect is "jurisdictional". This may overstate the implications of the issue involved. Alleged violations of the territorial jurisdiction's limitations were not such a "core" concern of Congress in enacting Title III as to be cognizable on a *habeas corpus* petition; such violations are "merely formal or technical errors." *Adams v. Lankford,* 788 F.2d 1493, 1497–1500 (11th Cir.1986).

More to the point, defendants' motions raise the issue of where the "interception" occurred: at the place in New Jersey where electronic means to divert the impulses containing the conversations were installed, or at the place in New York where the impulses were converted into sound and were heard by humans (or by a recording machine as surrogate for the human ear—*see U.S. v. Turk,* 526 F.2d 654, 658 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976)).

The answer is given by the definition of "intercept" in the statute: Section 2510(4) defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device".

The case law interprets the term "aural acquisition" to mean where the communication is actually heard or where it is recorded.

In *Evans v. State,* 252 Ga. 312, 314 S.E.2d 421, *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), wiretaps were authorized by a Fulton County Superior Court judge. Some of the telephones that were tapped, and the equipment to intercept calls to those telephones, were located outside of Fulton County. The calls, however, were monitored by a surveillance team in Fulton County. Defendants argued that the judge lacked jurisdiction to authorize wiretaps on telephones located outside of Fulton County. The Georgia Supreme Court applied Title III to wiretaps authorized by a state judge, and found that the aural acquisition occurred where the calls were heard. "It is undisputed that the only aural acquisition of the defendant's communications occurred in the Atlanta Judicial Circuit (Fulton County) where the judge authorizing the investigative warrants was sitting. We therefore find that federal law authorized issuance of these warrants by the Fulton Superior Court judge." *Id.* 314 S.E.2d at 426.

The defendants filed a habeas corpus petition in federal court, again arguing that the Fulton County Court judge lacked jurisdiction to authorize the wiretaps. The district court rejected the argument, stating:

Section 2518(3) requires that the judicially-approved "interception" must occur in the territorial jurisdiction of the court in which the judge issuing the wiretapping order is sitting—in this case, Fulton County. The undisputed facts in this case (and petitioners' allegations, since they only dispute the state courts' legal conclusion based on these facts) show that the "listening post," at which the challenged evidence was recorded, was located in Fulton County. Title III defines "intercept" as the *"aural* acquisition of the *contents* of any wire or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). (emphasis added). The legislative history accompanying Title III indicates that the definition of "intercept" is "intended to protect the privacy of the communication itself and not the means of communication." S.Rep. No. 1097, 90th Cong., 2d Sess. 90,

*reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2178. Therefore, the "interceptions" which are at issue in this case occurred *not* where the tapped telephone calls were mechanically interfered with (something which occurred with respect to twenty-three telephones located outside of Fulton County, as well as eighteen telephones located in Fulton County) but *where the contents of the telephone calls—the conversations—were heard or aurally acquired.*

*Adams v. Stynchcombe,* C84–2312A, slip op. at 8–10, (N.D.Ga. Mar. 5, 1985) (emphasis in original), *aff'd on other grounds, sub nom. Adams v. Lankford,* 788 F.2d 1493 (11th Cir.1986).[4]

The defendants in *Castillo v. State,* 761 S.W.2d 495 (Tex.Ct.App.1988) made the same argument, but with respect to the Texas wiretapping statute. The Texas statute provides that "only the judge of competent jurisdiction for the administrative judicial district in which the proposed interception will be made may act on an application for authorization to intercept wire, oral, or electronic communications." Tex.Crim.Proc.Code Ann. Art. 18.20, Sec. 3(b) (Vernon Supp.1990). A judge for the third administrative district authorized wiretapping of defendants' telephones, which were located in the first administrative district. The calls were intercepted and heard in the third administrative district. The Texas Court of Appeals held that the judge had jurisdiction to order the wiretaps, stating: " 'Intercept' means the aural acquisition of the contents of a wire communication through the use of an electronic, mechanical or other device. Article 18.20, Sec. 1(3), V.A.C.C.P.[5] An aural acquisition takes place where the telecommunications are heard and recorded." *Id.* at 505, citing *Evans v. Georgia,* 314 S.E.2d 421.

The logic of these cases is illustrated by a comparison with pen registers. For the very reason that a pen register does not hear sound and therefore does not accomplish an "interception" of wire communications as that term is defined by 18 U.S.C. § 2510(4), the use of pen registers as a device to monitor and record the numbers dialed from a particular telephone was not governed by Title III. *See United States v. New York Telephone Co.,* 434 U.S. 159, 165–67, 98 S.Ct. 364, 368–70, 54 L.Ed.2d 376 (1977). It is the capacity of the wiretap to hear and to disclose the contents (the Court emphasized "the *aural* acquisition of the *contents*", *id.* at 166, 98 S.Ct. at 369 (italics in original)) of the communication which brought it under Title III, and which supports the logic of recognizing the jurisdiction of the court at the place where the wiretap is overheard and monitored.

Accordingly, Judge Leisure had jurisdiction to authorize the wiretaps of telephones in New Jersey.

(ii) Need for surveillance

■ Section 2518(1)(c) provides that each application for an order approving surveillance must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous...." The requirement is " 'simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *U.S. v. Lilla,* 699 F.2d 99, 102 (2d Cir.1983), quoting *U.S. v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

Agent Bambach provided a detailed explanation of why wiretapping was needed. Physical surveillance was providing little direct evidence of the significance of meetings between co-conspirators.[6] Telephone

---

**4.** The Eleventh Circuit Court of Appeals did not reach the merits of the interception dispute because the alleged violations of the Act were not cognizable on habeas review. *See, supra,* p. 120.

**5.** This definition closely parallels the Act's definition of "intercept".

**6.** *See U.S. v. Ramirez,* 602 F.Supp. 783, 790 (S.D.N.Y.1985) (recognizing "the inherent limitations on the use of physical surveillance ... for purposes of gathering evidence for trial").

toll records and pen registers would not reveal the substance of the conversations or their participants.[7] Using the grand jury would not be helpful because the witnesses who could provide information were part of the conspiracy, and would likely not testify voluntarily. Moreover, it would alert the subjects that they were being investigated. Using grand jury subpoenas would not be helpful because low-level confederates would not be able to provide information about the manner in which their higher-level confederates were running the organization. Obtaining search warrants would be premature because it was not known where all the cocaine and other evidence of narcotics trafficking was being stored. Although undercover agents and confidential informants had infiltrated the organization, it was unlikely that they would be able to obtain detailed information about the full scope of the organization because Rodriguez and his associates were wary of informants. They had recently fled to Florida and partially or totally suspended their drug dealing when one of their colleagues, whom they believed was providing information to New York State authorities, was arrested.

The defendants argue that wiretaps were unnecessary because the investigation had been successful. They state:

the Government already knew the identity and roles of the principal conspirators; the location of the apartments where sales occurred, contraband was kept, money was accounted for, and deals were made; the names of upstream suppliers; evidence of and arrests on hand-to-hand sales; in short, the government had enough evidence to justify prosecuting the case....

Defendants' memo in support of pre-trial motions, p. 3.

It is possible that at the time the government applied for the wiretaps, it could have brought indictments against Rodriguez, and a few other members of the organization. But, as Agent Hannan stated in his

affidavit, the government did not know the identity of many of the other members of the organization, did not know all the locations where the narcotics and other evidence of narcotics trafficking were being stored, and did not know many significant details about the inner workings of the organization.

The government satisfied its burden under section 2518(1)(c) of showing that wiretapping was necessary to expose the criminal activity involved here. It had used physical surveillance, pen registers, undercover agents and informants, but those techniques were unsuccessful in uncovering the full scope of the conspiracy. This was because the organization relied on the telephone to conduct its day-to-day operations. Under these circumstances, the government was justified in applying for wiretaps. *See U.S. v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987) ("wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation"), citing *U.S. v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

Accordingly, defendants' motion to suppress evidence obtained from the wiretaps on the grounds that the government failed to show that wiretapping was necessary is denied.

### (iii) Minimization

Defendants move for suppression of all communications intercepted on the grounds that the monitoring agents failed to meet the statutory requirement that wiretapping "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5).

██ Defendants lack standing to make this motion. Only one who has a privacy interest in the tapped telephone or the residence where the telephone is located can challenge the minimization of intercepted

---

7. *See U.S. v. Martino*, 664 F.2d 860, 868 (2d Cir.1981) (use of pen registers and acquisition of telephone records would have been unavailing since they wouldn't identify the participants to a telephone conversation, and would thus be unlikely to uncover defendant's partners in crime), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

communications. *U.S. v. Fury,* 554 F.2d 522, 525–26 (2d. Cir.1977), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1978); *U.S. v. Poeta,* 455 F.2d 117, 122 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *U.S. v. Squitieri,* 688 F.Supp. 163, 169 (D.N.J.1988), *aff'd,* 879 F.2d 859 (3d Cir.1989).

The telephone tapped at the office was subscribed to by Awilda Salcedo, but she likely does not have a privacy right in it because it was not located in her residence. In *U.S. v. Hinton,* 543 F.2d 1002 (2d Cir. 1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), defendants were charged with participating in a large-scale drug ring. Wiretaps were authorized on defendant Barbara Hinton's home, and on an apartment in the Bronx used by the drug ring. The defendants argued that the government failed to minimize the interception of the communications. The Second Circuit reached the merits of defendants' argument, but stated that "it is doubtful that any of the appellants, aside from Hinton, even has standing to challenge minimization; and she may only have standing to challenge the wiretap at her residence on Staten Island. The Bronx apartment was not used as a residence by any of the appellants." *Id.* at 1012–1013 n. 13, citing *Poeta,* 455 F.2d. at 122. It is unclear whether Hinton subscribed to the Bronx telephone.

Although Ms. Salcedo's subscription to the telephone at the office may give her a greater privacy interest than Hinton, it is unnecessary to decide whether she has standing to challenge the minimization of interceptions on that telephone. The government states "that Ms. Salcedo does not join in the defendant's Omnibus Motion, and does not otherwise challenge minimization on her telephone." (Government's memo in opposition, p. 21) (herein "Gov. mem."). Ms. Salcedo does not contest this statement.

The four other telephones tapped were located at the restaurant owned by Roberto Rodriguez, the Imperio Cafe. Even assuming he had a privacy right in them,[8] he has pled guilty, and is thus not a party to the present motions.

Since none of the other defendants have a privacy right in the telephones tapped, they lack standing to challenge minimization.

(iv) Sealing

Garner claims that the tapes of the intercepted conversations were sealed by a magistrate, in violation of section 2518(8)(a). That section provides: "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." Since the tapes were sealed by the Hon. Miriam G. Cedarbaum, a United States District Judge, Gardner's claim is meritless.[9]

(b) Pen registers

■ Garner argues that the magistrate lacked jurisdiction to order the installation of pen registers on telephones in New Jersey, and that "Since the information obtained from the illegal installation of pen registers was used to obtain the wiretap orders, the evidence derived therefrom must be suppressed as the fruit of the poisonous tree." (Garner's memo in support, p. 4). The fruit of the poisonous tree doctrine provides that when there has been an illegal search and seizure, or an invalid arrest, any evidence derived therefrom is the "fruit" of the illegality and is thus inadmissible. *See Wong Sun v. U.S.,* 371 U.S. 471, 485–87, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963).

The argument is disposed of, adversely to Garner, by the ruling upholding Judge Leisure's jurisdiction with respect to the New Jersey wiretaps.

Garner's separate claim that magistrates lack authority to authorize the installation

---

**8.** Two of those telephones were pay phones.

**9.** It is the practice of this district to have matters regarding wiretaps handled by the "Part I" judge. Judge Leisure was sitting in Part I when the government applied for an order authorizing the wiretaps. Judge Cedarbaum was sitting in Part I when the tapes were sealed.

of pen registers is incorrect. Under 18 U.S.C. § 3122(a), the government may make an application for an order authorizing the installation of a pen register "to a court of competent jurisdiction." A court of competent jurisdiction is defined as "a district court of the United States (including a magistrate of such a court)". 18 U.S.C. § 3127(2)(A). Accordingly, magistrates have statutory authority to authorize the installation of pen registers.

3. **Probable cause to issue the search warrants**

Defendants Manuel Carrillo, Nelson Noa and Nelson Garcia move to suppress physical evidence obtained from searches of their apartments, arguing that the magistrate lacked probable cause to issue the search warrants.

■ Probable cause to issue a search warrant is evaluated by the "totality of the circumstances". *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Ibid.* The magistrate's finding of probable cause is entitled to substantial deference, *U.S. v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), and is itself a substantial factor tending to uphold the validity of the warrant. *U.S. v. Jackstadt*, 617 F.2d 12, 13 (2d Cir.) (per curiam), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). "In sum, the applicable standard from these principles is that there be a fair probability that the premises will yield the objects specified in the search warrant." *U.S. v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983), citing *Illinois v. Gates*, 462 U.S. at 246, 103 S.Ct. at 2336.

In support of its application for search warrants and arrest warrants for all of the defendants, the government submitted the affidavit of Drug Enforcement Agent Mark Hannan, which explained in detail the nature of the organization, listed the places where it carried out its activities and described the roles of the various members of the organization.[10]

(a) Manuel Carrillo

■ With respect to Manuel Carrillo, Agent Hannan stated that a confidential informant, who had been a shift supervisor at the retail outlet, provided information that Carrillo was the primary "cooker" for the organization.[11] Physical surveillance of Carrillo showed that:

On July 9, 1989 Carrillo's car was in front of 1725 Purdy Avenue, the Bronx, where one of the stash pads was located. Carrillo entered his car, and drove to the intersection of Lafayette and Bryant. He left his car, and talked with defendants Evaristo Valentin and "El Negro."[12] Carrillo then drove to his residence at 1121 Fteley Avenue, the Bronx. He removed two large white bags from the car, and entered his residence. One hour later, he drove back to the corner of Lafayette and Bryant. He exited his car, and talked with defendant Pastor Cruz. Carrillo then entered the office. He left shortly thereafter, carrying a small brown paper bag. He drove to 3405 Kossuth Avenue, and entered apartment # B–1, carrying the brown bag. Apartment # B–1 is the residence of defendant Jose Cots, another alleged cooker for the organization. He returned to his apartment less than an hour later.

On July 14, 1989 Carrillo was walking with Cots from the direction of 1725 Purdy Avenue. Carrillo was carrying a large white plastic bag that appeared to be full. Carrillo and Cots entered Carrillo's car, and drove to 210th Street, where Cots exited the car. Carrillo drove home, entering his

**10.** *See* n. 2 and p. 118, *supra.*

**11.** Hannan referred to Carrillo by his alias, "Rosado."

**12.** El Negro is a fugitive.

apartment with the white bag. Later, Carrillo left the house, carrying a package wrapped in foil. He drove back to 210th Street, and picked up Cots. They drove to 1595 Metropolitan Avenue, where another stash pad was located. They entered the stash pad, with Cots carrying the package. Later, defendants Noel Aguero and El Negro entered the stash pad. After a half-hour, Aguero and El Negro left the stash pad, carrying a large white plastic bag.

Based on the informant's statements and the physical surveillance, Agent Hannan stated that a search of Carrillo's residence would likely produce evidence of narcotics trafficking.

Carrillo argues that the surveillance did not establish probable cause to search his apartment. He claims that there was no evidence that he "cooked" in his apartment, or that he stored contraband there, and there was nothing to indicate that the bags he carried into the apartment contained illegal items. He also argues that the probable cause for the warrant was stale. He states that the warrant was issued on July 21, 1989, one week after he was seen entering his apartment with the plastic bag, and assuming that the bag contained cocaine, "the drugs would have been cooked and removed for sale quickly." (Carrillo's memo in support, at ¶ 36).

Carrillo's arguments lack merit. The confidential informant's statement that Carrillo was the primary cooker for the organization and the physical surveillance of Carrillo showed that he was involved in the conspiracy. That Carrillo entered his apartment carrying a large white plastic bag and then exited with a small package wrapped in foil, by itself, seems innocuous. However, it must be remembered that Carrillo entered his apartment after coming from the direction of a stash pad, accompanied by Cots (another alleged cooker for the organization), and that he exited his apartment and brought the small package to another stash pad, again accompanied by Cots. This transforms otherwise innocuous behavior into suspicious behavior. Thus, the magistrate was justified in concluding that there was a fair probability that Carrillo was using his apartment to engage in narcotics related activities.

█ Carrillo's argument that the determination of probable cause was stale because he would have cooked the cocaine quickly ignores the probability that if he was using his apartment to cook cocaine, there was likely to be other evidence of narcotics trafficking there. Moreover, the investigation of the organization uncovered evidence of a large-scale ongoing drug trafficking conspiracy. Thus, the evidence would not have become stale after a mere seven day hiatus. *See U.S. v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) ("Although the search warrant issued thirty-five days after the Caffe Palermo incident, it was sought at the culmination of a major investigation into ongoing, long-term criminal activity. Such a time lag under these circumstances will generally not affect probable cause."), citing *U.S. v. Foster,* 711 F.2d 871, 878–879 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *U.S. v. Martino,* 664 F.2d 860, 867 (2d Cir.1981) (three week time lag does not make probable cause stale when there is ongoing drug conspiracy), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

Accordingly, Manuel Carrillo's motion to suppress evidence obtained from the search of his apartment is denied.

(b) Nelson Noa

█ With respect to Nelson Noa, Agent Hannan stated that a confidential informant had identified Noa's apartment as one of the organization's stash pads. Noa's apartment was located at 743 Hunts Point Avenue, # 4–E. The informant was a manager of the organization's retail outlet, but was arrested on drug charges in March 1989. Before his arrest the informant had been to Noa's apartment, where he saw crack being packaged by Noa and others. After his arrest, the informant had spoken with another worker in the organization, who confirmed that Noa's apartment was still being used to store and package crack.

On July 11, 1989 DEA Agents seized $63,200 from the trunk of Evaristo Valentin's car. The next day Roberto Rodriguez

called defendant Juan Carrero, a real estate agent, and told him to get rid of apartment # 2–F,[13] but that he would keep apartment # 4–E.

Noa attacks the confidential informant's statements as insufficient to support a determination of probable cause. He claims that: (1) there is no information that the informant's statement was valid at the time of the warrant; (2) the informant's reliability had not been sufficiently demonstrated; and (3) the informant's statement that he had seen Noa packaging crack in the apartment was not corroborated.

The confidential informant's statements were sufficient to support the determination of probable cause. He had a concrete basis for making the statements, having been a manager of the organization's retail outlet, and having been in Noa's apartment. His statements were not stale, having spoken with another member of the organization who confirmed that Noa's apartment was still being used to store and package cocaine. The informant's reliability had been established because his statements with respect to other aspects of the organization's drug trafficking had been verified by physical surveillance and the wiretaps. Although Rodriguez's statement about apartment # 4–E was not the strongest corroboration, it provided another piece of evidence that Noa's apartment was being used for criminal activity. Under the totality of the circumstances, there was probable cause to issue the search warrant.

Accordingly, Nelson Noa's motion to suppress evidence obtained from the search of his apartment is denied.

(c) Nelson Garcia

■■■ With respect to Nelson Garcia, Agent Hannan averred[14] that wiretaps on the telephones at the Imperio Cafe showed the following:

On June 28, 1989 defendant Earl Garner called Garcia at the Imperio Cafe. Garcia stated that he would be ready tomorrow, and told Garner to come with "ninety."

Garner responded that he did not want to bring money because police at an airport had once taken money from him. Garcia told Garner that he was prepared to give him "16" and a "few," but that he needed the money. Garcia stated that if he gave Garner "that" first, he would need the money within an hour or two. Garcia told Garner that he wanted to "make[ ] some points" with "these people" because they are new, and that "you got 90, 100, okay, I let you get away with 30, 40, 50.... I could give you a little break."

On June 29, 1989 someone called Garcia and told him that Garner had called, and that he would be arriving at Newark Airport at 4:00 p.m. that day. At 7:00 p.m. Garcia was seen with a man believed to be Garner leaving the Imperio Cafe, and driving to Newark Airport. Later, Garcia spoke with an unidentified male, stating that he spoke to the "man" that morning, and that the man "loved the thing." Garcia said that "he doesn't want half, he wants a whole." Garcia and the unidentified man confirmed that they would have the whole.

On June 30, 1989 Roberto Rodriguez telephoned his girlfriend, defendant Mirella Pacheco, from the Imperio Cafe. She told him "the car has a mileage of seventy-eight thousand, seven hundred and forty." She added that Rodriguez had not left her any money. He responded "Well ... take the seven hundred and forty and take it." Rodriguez then called Garcia and told him that Pacheco had called, and that there was "seventy eight, seven forty" and that "There was missing ... one thousand, two hundred sixty." Garcia ended the conversation by saying "I'll go, I'll go."

On July 1, 1989 Rodriguez called Garcia at his apartment, asking him to "check my suitcase ... to see if I have ... six pairs of underwear in there." After a long pause, Garcia returned to the telephone, stating "Yes, all the clothes are there."

Physical surveillance of Garcia showed that on July 3, 1989 he was seen with

13. The stash pad at 1725 Purdy Avenue was located in apartment 2–F.

14. Agent Hannan referred to Nelson Garcia by his alias, "Nelson Cabilla".

Rodriguez and defendant Manuelito "Lnu"[15] entering the stash pad at 1725 Purdy Avenue in the Bronx. Ten minutes later, defendants Evaristo Valentin and Aurea Rodriguez entered the building. Valentin was carrying what appeared to be a ledger book, and Rodriguez was carrying a yellow plastic bag and a brown paper bag. Five minutes later, all five defendants left the building. Roberto Rodriguez was carrying the ledger book and the yellow plastic bag, Aurea Rodriguez was carrying the brown paper bag, but it was nearly empty with the top rolled down.

Hannan stated that based on the evidence of the relationship between Rodriguez and Garcia, and on the fact that Rodriguez did not live at Garcia's apartment, it was his opinion that the term "underwear" was a code word for contraband (narcotics or money), and that Garcia was storing contraband for Rodriguez at his apartment.

Garcia attacks the magistrate's determination of probable cause, stating "all that is established is a prior relationship between Garcia and Rodriguez along with a questionable interpretation of intercepted telephone conversations. The conclusion that these few facts established probable cause to search Garcia's premises, amount to little more than 'wishful thinking' on the part of the agents." (Garcia's memo in support, at ¶ 6).

The magistrate could reasonably conclude, however, that the intercepted phone calls and the physical surveillance of Garcia revealed involvement in the drug conspiracy. Moreover, Agent Hannan's expert opinion that the reference to underwear was a code word for contraband and that Garcia's apartment would therefore contain evidence of narcotics dealings is entitled to substantial weight in determining probable cause. *U.S. v. Benevento*, 836 F.2d 60, 71 (2d Cir.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988), citing *Fama*, 758 F.2d at 838. Thus, the magistrate properly concluded that there was a fair probability that Garcia was stor-

ing contraband for Rodriguez in his apartment.

Accordingly, Nelson Garcia's motion to suppress evidence obtained from the search of his apartment is denied.

**4. Garcia's and Garner's motions to dismiss for improper venue**

█ Garcia and Garner both move to dismiss the indictment against them, arguing that venue is improper in this district because they did not commit any criminal act here. They claim that the evidence shows that there were two distinct conspiracies—a large-scale conspiracy to distribute crack in the Bronx and a separate conspiracy between Garcia and Garner to distribute cocaine in New Jersey.

Nothing in the submissions made so far indicates that a conclusion that there were two conspiracies is a more likely trial outcome than that there was one.

Garcia's assertion that he himself did not commit any act in furtherance of the conspiracy in the Bronx is immaterial. Venue is proper here because the indictment charges that other defendants committed acts in furtherance of the conspiracy in the Bronx.[16] *See Word v. U.S.*, 589 F.Supp. 806, 807 (S.D.N.Y.1984), citing *U.S. v. Lewis*, 676 F.2d 508, 511 (11th Cir.1982) ("It is firmly settled law that a conspiracy may be prosecuted in any district in which the agreement was formed or in which there was an act in furtherance of the conspiracy.")

With respect to Earl Garner, the wiretaps showed that he called Garcia at the Imperio Cafe to discuss the deal. Garcia told him that he wanted to "make[ ] some points" with "these people" because they are new, and that "you got 90, 100, okay, I let you get away with 30, 40, 50 .... I could give you a little break." Garcia also had two telephone conversations from the Imperio Cafe with unidentified individuals concerning the sale to Garner.

One might fairly infer that the sale to Garner was made as part of the narcotics

---

**15.** Manuelito "Lnu" is a fugitive.

**16.** The Bronx is part of the Southern District of New York.

conspiracy charged in count one. Whether the evidence will show that Garner was a part of that conspiracy must await the trial. If it does, the fact that Garner may not have committed any acts in furtherance of the conspiracy in the Bronx will be immaterial, since the indictment charges that other defendants committed acts in furtherance of the conspiracy in the Bronx.

Accordingly, Garcia's and Garner's motions to dismiss for improper venue are denied without prejudice to renewal as a motion for acquittal pursuant to Fed.R. Crim.P. 29(a).

5. Garner's motion for inspection of the grand jury minutes and to dismiss the indictment because of prosecutorial misconduct

 Garner requests that the court inspect the grand jury minutes, and then dismiss the indictment. He claims that an inspection of the grand jury minutes will show that the prosecutor improperly instructed the grand jury because the evidence does not: (1) show that he committed any crime, or (2) connect him to the conspiracy charged in count one.

No particularized proof of any irregularity is offered to overcome the presumption of validity of grand jury proceedings, and accordingly, Garner's motion for the court to inspect the grand jury minutes is denied. *See, e.g., United States v. Cummings,* 49 F.R.D. 160, 161 (S.D.N.Y.1969).

6. Noa's motion to exclude mention of "Marielito Cubans" at trial

Nelson Noa moves pursuant to Fed.R. Evid. 401 & 403 to preclude the government from referring at trial to the following terms: " 'Mariel Boatlift,' 'Marielito', 'Cuban refugees,' or any word or phrase which directly or indirectly describes any defendant compelled to leave Cuba during what is now commonly referred to as the 'Mariel Boatlift' ". (Noa memo in support, at ¶ 6).

The government responds that reference to defendants' common bonds as Cuban refugees is relevant to proving the existence of the conspiracy, since it "not only

tends to support the Government's assertion that the defendants in fact knew each other and conspired with each other, but more importantly helps explain the bond of confidence that permitted the defendants to trust each other in the pursuit of a criminal enterprise where the penalties for detection were severe and the danger of government informants high." (Gov. mem. p. 64).

This motion raises a matter that is best determined at trial. Accordingly, Noa's motion to exclude reference to the defendants' common Cuban heritage is denied without prejudice to renewal at trial.

7. Use of aliases in the indictment

Defendants move to strike all references to aliases in the indictment, arguing that the use of aliases is prejudicial because "many people automatically conclude that anyone who has an 'a/k/a' must be up to no good." (Defendants' memo of law in support of pre-trial motions, p. 16).

 Use of aliases in the indictment is permissible "If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment". *U.S. v. Clark,* 541 F.2d 1016, 1018 (4th Cir.1976), citing *U.S. v. Skolek,* 474 F.2d 582, 586 (10th Cir.1973) and *U.S. v. Miller,* 381 F.2d 529 (2d Cir.1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968).

> Here, the government states that it will prove at trial that the defendants used the names set forth in the Indictment, and that at the time of the events to be recounted, they were referred to by those names. Proof of the nicknames and aliases is necessary to identify the defendants as the parties who engaged in various acts charged in the Indictment. Indeed, some tape recorded conversations and various written documents the Government intends to offer at trial include references to some of these nicknames, and the testimony at trial with respect to the defendants will also refer to them by their nicknames. Gov. mem. p. 65.

 Accordingly, "the aliases will thus be relevant to the case and will constitute

part of the government's proof at trial. Moreover, the aliases at issue are not inherently prejudicial. Under the circumstances, inclusion of the aliases in the indictment is proper and, indeed, may well serve to obviate jury confusion." *U.S. v. Esposito*, 423 F.Supp. 908, 911 (S.D.N.Y. 1976) (footnote omitted).

Defendant's motion to strike references to aliases in the indictment is denied.

## CONCLUSION

Defendants' motions to suppress evidence obtained from wiretaps and to exclude reference to aliases in the indictment are denied.

Manuel Carillo's, Nelson Noa's, and Nelson Garcia's motions to suppress evidence obtained from searches of their residences are denied. Noa's motion to exclude reference to the defendants' common Cuban heritage is denied without prejudice to renewal at trial. Garcia's and Garner's motions to dismiss the indictment against them for improper venue are denied, as is Garner's motion to dismiss the indictment against him for prosecutorial misconduct.