UNITED STATES of America, Appellee,

v.

Roberto RODRIGUEZ, Luis Rosado, also known as Manuel Carillo, Nelson Noa, Rafael Flores, Ronnie L'Rue, Mirella Pacheco, Jose Cots, Nelson Garcia, also known as Nelson Cabilla, Noel Aguero, Defendants–Appellants.

Nos. 28, 527–533 and 703, Dockets 91–1152, 91–1160, 91–1167, 91–1169, 91–1170, 91–1228, 91–1286, 91–1287 and 91–1379.

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1991.

Final Briefs Submitted Nov. 22, 1991.

Decided April 9, 1992.

---

Nelson W. Cunningham, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Amy E. Millard, Asst. U.S. Atty., New York City, on the brief), for appellee.

Roger L. Stavis, New York City (Steven R. Kartagener, Kartagener & Stavis, on the brief), for defendant-appellant Roberto Rodriguez.

Michael F. Bachner, New York City, for defendant-appellant Luis Rosado.

Philip Katowitz, New York City, for defendant-appellant Nelson Noa.

David Cooper, New York City, for defendant-appellant Rafael Flores.

Gerald J. McMahon, New York City, for defendant-appellant Ronnie L'Rue, joined the brief submitted for defendant-appellant Flores.

Vincent L. Verdiramo, Jersey City, N.J. (Verdiramo & Verdiramo, on the brief), for defendant-appellant Mirella Pacheco.

Daniel Meyers, New York City, for defendant-appellant Jose Cots.

Martin J. Seigel, New York City, for defendant-appellant Nelson Garcia.

Joyce London, New York City (Susan G. Kellman, on the brief), for defendant-appellant Noel Aguero.

Before: FEINBERG, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Roberto Rodriguez ("Rodriguez") appeals from a judgment of the United States District Court for the Southern District of New York, Louis L. Stanton, *Judge*, convicting him, following his plea of guilty, on one count of conducting a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a), 853(a)(1), 853(a)(2), and 853(a)(3) (1988). Defendants Luis Rosado, Nelson Noa, Rafael Flores, Ronnie L'Rue, Mirella Pacheco, Jose Cots, Nelson Garcia, and Noel Aguero appeal from judgments entered in the same court following a jury trial before Judge Stanton, convicting all of them except Noa on one count of conspiracy to possess with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846 (1988). Noa was convicted of possession of approximately 18 grams of crack, in violation of 21 U.S.C. § 844(a) (1988). Rodriguez was sentenced principally to 360 months' imprisonment and ordered to forfeit assets in the amount of $550,000. Garcia, having two prior narcotics felony convictions, was sentenced to life imprisonment. The remaining appellants were sentenced principally to the following prison terms: Rosado, 192 months; Noa, 60 months; Flores, 222 months; L'Rue, 240 months; Pacheco, 151 months; Cots, 204 months; and Aguero, 300 months.

On appeal, appellants make numerous arguments, including principally (1) their contention that the district court erred in refusing to suppress evidence obtained through court-authorized wiretaps, (2) Rodriguez's contentions that he should be allowed to withdraw his plea of guilty, and (3) Rodriguez's challenges to his sentence. For the reasons below, we reject all of appellants' contentions and affirm the judgments of conviction.

## I. BACKGROUND

The present prosecution arises out of the investigation of a crack organization in the Bronx, New York, headed by Rodriguez (the "Rodriguez Organization" or "Organization"). The government's proof at trial included (1) the testimony of coconspirator Evaristo Valentin, who had been Rodriguez's right-hand man overseeing the operation of the Organization, and of Aurea Rodriguez (not related to Roberto Rodriguez), another former member of the Organization; (2) excerpts of telephone conversations recorded by means of court-authorized wiretaps; (3) surveillance videotapes; (4) unpackaged crack and cocaine, packaging materials, and more than 3,000 vials filled with crack, seized from more than 20 locations; and (5) other physical evidence including detailed drug records. The evidence, taken in the light most favorable to the government, painted the following overall picture.

From prior to 1988 until July 1989, Rodriguez presided over a large-scale narcotics operation in the Hunts Point section of the Bronx. The Organization operated a retail crack outlet that was open for business 24 hours a day, seven days a week. From this outlet an average of 1,200 to 2,600 vials of crack, at $5 per vial, were sold every day. The Organization also maintained many apartments in Hunts Point and elsewhere in the Bronx for processing, packaging, and storing the crack, or for storing drug records and profits.

Proceeds from the crack sales, often stored temporarily in an apartment occupied by Aurea Rodriguez, were eventually taken to the Imperio Cafe, a restaurant

owned by Roberto Rodriguez in New Jersey. L'Rue, the cafe's cook and manager, received and counted the money and ultimately delivered it to Rodriguez. The other appellants played various other roles in the Organization. Garcia was one of Rodriguez's main suppliers of cocaine; Flores was a courier who sometimes cooked cocaine into crack; Rosado and Cots served as, *inter alia,* packagers; and Aguero was the boss of one of the two daily shifts at the retail outlet, ensuring that there was sufficient packaged crack available for sale. Pacheco was Rodriguez's wife or girlfriend and served as his general assistant, at various times packaging and transporting crack, or counting and transporting the proceeds from the sales.

The investigation of the Rodriguez Organization's operations included raids in 1988 pursuant to search warrants, physical surveillance and videotaping, court-authorized pen registers, and court-authorized wiretaps in 1989 on four telephones at the Imperio Cafe and on the Bronx telephone of Aurea Rodriguez. Appellants and other members of the Organization were arrested in July 1989 as part of a coordinated series of raids.

The initial indictment charged 22 persons, including appellants, with participating in a large-scale narcotics conspiracy, in violation of 21 U.S.C. § 846, and charged Roberto Rodriguez as well with, *inter alia,* conducting a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a). Rodriguez entered into a written cooperation agreement with the government, in which he agreed to plead guilty to the continuing criminal enterprise count and agreed to forfeit assets. The government agreed to withdraw the other counts against him and to recommend a downward departure in sentencing if he gave the government substantial assistance in the investigation or prosecution of other persons. As discussed in greater detail in Part II.B. below, after a hearing that included inquiry into a potential conflict of interest on the part of the attorney then representing Rodriguez, the district court accepted the plea.

Following the guilty pleas of Rodriguez and others, a superseding indictment was filed against the remaining defendants. To the extent pertinent here, count 1 of the superseding indictment charged appellants other than Rodriguez with conspiracy; count 2 charged Noa with possession of 18.2 grams of crack with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A) (1988). As discussed in greater detail in Part II.A. below, prior to trial defendants moved to suppress information obtained through the wiretaps on the Imperio Cafe telephones, contending that the orders purporting to authorize the pen registers and wiretaps were jurisdictionally defective because they were issued by a federal court in New York, rather than a court in New Jersey, the jurisdiction in which the telephones were located. In an opinion reported at 734 F.Supp. 116 (1990), the district court concluded that the orders complied with the pertinent statutory requirements. It ruled that since the telephone communications were actually heard and recorded at United States Drug Enforcement Administration ("DEA") headquarters in Manhattan, which is within the Southern District of New York, and the pen register information was received there as well, the use of the pen registers and the interceptions of the conversations occurred in the Southern District of New York and thus within the territorial jurisdiction of the issuing authorities. *Id.* at 120–21, 123. Accordingly, it denied the motions to suppress.

After a 13–week trial at which, *inter alia,* Valentin described in detail the Rodriguez Organization's operations and the government introduced some 90 conversations intercepted by means of the wiretaps, the jury found all of the appellants who were tried, except Noa, guilty of conspiracy to possess with intent to distribute more than 50 grams of crack. Noa was acquitted of conspiracy; he was also acquitted of possession of crack with intent to distribute but was found guilty of the lesser included offense of simple possession of crack, in violation of 21 U.S.C. § 844(a). Appellants were sentenced as indicated above. The 360–month sentence on

Rodriguez, imposed after the trial of his codefendants, represented a substantial upward departure from the range of imprisonment established by the applicable version of the federal Sentencing Guidelines ("Guidelines").

These appeals followed.

## II. DISCUSSION

On appeal, appellants other than Rodriguez contend principally that they are entitled to a new trial on the ground that the court orders authorizing the wiretaps and pen registers on the New Jersey telephones were jurisdictionally defective and that the information obtained from the wiretaps should therefore have been suppressed. Rodriguez contends principally (a) that his case should be remanded to permit the district court to determine whether he may withdraw his plea because of his first attorney's conflict of interest, or alternatively (b) that his sentence should be vacated because the district court failed to follow proper sentencing procedures. Appellants also make a variety of additional arguments that we conclude are without merit and warrant little or no discussion.

### A. *The Pen Register and Wiretap Authorizations*

In April and May of 1989, in connection with its investigation of the Rodriguez Organization, the DEA obtained authorizations from magistrate judges in the Southern District of New York to install and use pen registers on four telephones at the Imperio Cafe ("Cafe phones"). In June 1989, relying in part on information obtained through the pen registers, the DEA obtained from District Judge Peter K. Leisure, of the same court, authorization for electronic interception of telephone calls to or from the four Cafe phones, and to or from Aurea Rodriguez's telephone in the Bronx. The order was entered on the government's representation, *inter alia,* that all of the interception equipment for these five telephones would be installed and used at DEA headquarters in the Southern District of New York. Appellants contend that the orders entered in the

Southern District of New York for pen registers and wiretaps on the Cafe phones were not authorized by the federal statutes governing such matters, arguing that since the Cafe is located in New Jersey, lawful orders could only be obtained from a court in the District of New Jersey. For the reasons below, we disagree.

#### 1. The Pen Registers

A pen register is a mechanical device that simply records the telephone numbers dialed on a given telephone. It does not indicate whether the calls dialed were completed, and it does not capture the contents of the communications. *See generally United States v. New York Telephone Co.,* 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366 n. 1, 54 L.Ed.2d 376 (1977). Such devices are governed by 18 U.S.C. §§ 3121–3127 (1988), which allows a district court to authorize "the installation and use of a pen register ... within the jurisdiction of the court," *id.* § 3123.

■ In the present matter, after receiving authorization for the use of pen registers, the DEA arranged with New Jersey Bell Telephone Company to lease a telephone line running from near the Imperio Cafe to the DEA's Manhattan headquarters. The pen registers were installed, monitored, and used at DEA headquarters. Thus, though the telephones whose dialings were being registered were located in New Jersey, the pen registers themselves were located in the Southern District of New York. We conclude that the registers were installed and used within the jurisdiction of the court that issued the authorizations.

#### 2. The Wiretaps

The installation and use of wiretaps are governed by the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–2521 (1988). The section on which appellants focus provides that a "judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting." 18 U.S.C. § 2518(3). The term "intercept[ion]" is defined as "the

aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

█ The statute does not specify precisely where an interception is deemed to occur. It seems clear that when the contents of a wire communication are captured or redirected in any way, an interception occurs at that time. Such an interception plainly occurs at or near the situs of the telephone itself, for the contents of the conversation, whether bilateral as is usually the case, or multilateral as is the case with a conference call, are transmitted in one additional direction. Redirection presupposes interception. Accordingly, a federal court sitting in the jurisdiction in which the to-be-tapped telephone is located would have the authority, under § 2518(3), to authorize a wiretap.

Nonetheless, since the definition of interception includes the "aural" acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard. *See Webster's New International Dictionary,* at 182 (2d ed. unabridged 1957) (defining "aural" as "of or pertaining to the ear or the sense of hearing"). Indeed, prior to 1986, Title III's definition of interception focused on "aural acquisition[s]" alone. The phrase "or other" was inserted into the present definition as part of a modernization of Title III to ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications. *See generally* S.Rep. No. 99–541, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News ("USCCAN") 3555, 3555–57, 3562–65, 3567; *see also United States v. Hux,* 940 F.2d 314, 316 (8th Cir.1991). The amendment thus expanded a definition that previously had "only applie[d] where the contents of a communication c[ould] be overheard and understood by the human ear." USCCAN at 3556. Though it is plain that Congress intended to expand the scope of Title III to extend its protections to modern forms of communication, there is no indication in the legislative history that it intended to extinguish the principle that the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the situs of an interception within the meaning of § 2510(4).

Further, where the authorities seek to tap telephones in more than one jurisdiction and to monitor them in a single jurisdiction, there are sound policy reasons for permitting a court in the jurisdiction where all of the captured conversations are to be heard to grant the authorization. One of the key goals of Title III is the protection of individual privacy interests from abuse by law enforcement authorities. *See generally,* S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2185; *United States v. Giordano,* 416 U.S. 505, 514–23, 94 S.Ct. 1820, 1826–30, 40 L.Ed.2d 341 (1974). For example, Title III requires that a wiretap authorization not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization." 18 U.S.C. § 2518(5). If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided. We doubt that Congress intended to eliminate this possibility.

In sum, the language of § 2510(4), the legislative history of that section, and the policy considerations of Title III all persuade us that for purposes of § 2518(3)'s jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard. Appellants' motion to suppress the evidence obtained through the wiretaps was properly denied.

B. *Rodriguez's Challenges to His Plea and Sentence*

Rodriguez's principal contentions on this appeal are (1) that he is entitled to a remand to permit him to move to withdraw his plea because of the possible conflict of interest on the part of his prior counsel; and (2) that the court failed to follow the

sentencing procedures required by *United States v. Kim*, 896 F.2d 678, 687 (2d Cir. 1990). We are unpersuaded.

### 1. The Possible Conflict of Counsel

The background of Rodriguez's arguments with regard to his plea of guilty is as follows. Prior to the hearing with respect to the plea, the government alerted the district court to circumstances giving rise to what it termed a "hypothetical" conflict of interest on the part of Rodriguez's then-attorney, Frank Lopez. While stating that it believed the circumstances did not give rise to an actual conflict, and that Lopez had reported that he had advised Rodriguez of the circumstances, the government asked the court to conduct a *Curcio* inquiry, *see United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), to ascertain whether Lopez had made appropriate disclosures and to ensure protection of Rodriguez's Sixth Amendment right to counsel.

At the first part of the hearing, in proceedings that were placed under seal and, except to the extent revealed here, remain under seal, Lopez described the details of his circumstances to the court. He stated that he had disclosed the pertinent details to Rodriguez, and he stated that Rodriguez was prepared to respond to questions from the court. Later, Lopez also stated that he had never discussed with the Assistant United States Attorney or anyone else any impact that his representation of Rodriguez might have on the other circumstances described to the court.

The court asked Rodriguez whether he understood Lopez's initial statement, and Rodriguez said he did. The court itself then described the circumstances to Rodriguez, who intermittently responded that he understood. The court described for Rodriguez what it termed the "worst possible" scenario and the consequent risk that Lopez could have a conflict of interest vis-a-vis Rodriguez. Rodriguez stated that he understood, that he had no questions, and that he did not want to consult another attorney. The court's questioning ended as follows:

THE COURT: Now, if you have any reluctance of any sort or you'd prefer to take some time to think this over or you'd like to talk to another lawyer about it out of Mr. Lopez' hearing and get another opinion or, as I say, if you're the least bit reluctant to proceed with Mr. Lopez, just say so and I'll give you the opportunity to think it over, to discuss it with any other lawyer that we could provide, to change counsel, whatever you wish in this connection. Would you like to do any of those things?

THE DEFENDANT: No.

THE COURT: Now, you understand that you could have separate counsel representing you?

THE DEFENDANT: That I could have?

THE COURT: Separate counsel, somebody else than Mr. Lopez.

THE DEFENDANT: No.

THE COURT: Do you understand you could have that?

THE DEFENDANT: Yes, I could, yes.

THE COURT: But you don't wish that. Is that what you're saying?

THE DEFENDANT: No.

THE COURT: You don't wish it?

THE DEFENDANT: No, I don't.

THE COURT: Do you wish to consult with any other counsel about this?

THE DEFENDANT: No, I don't want to consult about anything with any other attorney.

(First Plea Hearing Transcript dated February 27, 1990 ("Sealed Tr."), 11–12.) The court found that Rodriguez was

competent and understands the colloquy which we have had about [the possible conflict], that he appreciates the risk that Mr. Lopez' predicament might in some way temper or weaken Mr. Lopez' representation of Mr. Rodriguez, and that with that understanding in mind, he chooses not to consult with any other lawyer or to take time to think the situation over further or to avail himself of the offer of separate counsel, but willingly and voluntarily desires to proceed with the plea.

(*Id.* at 13.) Ordering that so much of the transcript as pertained to the conflict ques-

tion be sealed, the court stated that copies would be available to the government and Lopez without the need for a motion but would be available to others only upon application to the court.

After conducting further proceedings in open court with respect to Rodriguez's plea of guilty to the continuing criminal enterprise count, the court accepted the plea.

Several months after pleading guilty, Rodriguez obtained new counsel, Roger Stavis, and, as discussed in Part II.B.3. below, moved to withdraw his plea on the ground that he had entered that plea in the belief that the government would release Pacheco, his common-law wife, from the prosecution. In connection with that motion, Stavis sought access to the sealed portion of the plea hearing transcript. The court denied the request, stating that the subject matter was entirely collateral to the motion at hand. It reiterated that view when Stavis renewed his request at sentencing.

■ In his initial briefing of the present appeal, Rodriguez argued that his new attorney should have been given access to the sealed portion of the transcript and that the matter should be remanded to permit counsel, once access was given, to move to withdraw the guilty plea on the ground of his former attorney's conflict of interest. We agreed with Rodriguez that his new attorney should have been given access to the sealed transcript. Even if the matters there discussed had no relevance to the specific question that was raised in the motion to withdraw the plea, access should have been given to enable new counsel to determine whether the prior proceedings revealed any other ground for withdrawal of the plea, such as the adequacy of the allocution or the Sixth Amendment inquiry. In any event, new counsel should have been given access in order to enable him to determine whether the plea proceedings provided any grounds for appeal. Accordingly, at oral argument, we directed that the sealed portion of the transcript be made available to Rodriguez's counsel. We permitted both sides to submit supplemental letter briefs on the issue of whether, in light of the contents of the sealed transcript, a remand is necessary.

In his letter brief, Rodriguez contends that the sealed transcript reveals the existence of a serious conflict of interest on the part of Lopez. He argues that at this juncture the record is inadequate to permit this Court to decide the conflict-of-interest issue, and that a remand is necessary to develop a factual record. In light of the prevailing legal principles, we are unpersuaded.

The Sixth Amendment of course guarantees the defendant in a criminal trial the right to the effective assistance of counsel at all stages of the criminal prosecution, including the entry of a plea of guilty. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985). In a few cases we have found the circumstances to constitute a *per se* violation of the right to counsel. *See, e.g., United States v. Cancilla,* 725 F.2d 867 (2d Cir. 1984) (defendant's attorney assumed, *arguendo,* to be guilty of criminal conduct related to that of which the defendant was accused); *Solina v. United States,* 709 F.2d 160 (2d Cir.1983) (defendant's attorney had never been licensed to practice law). The circumstances involving Lopez were not of these kinds but rather involved a possible conflict of interest not arising out of his own conduct.

■ A defendant's Sixth Amendment right to effective assistance of counsel includes the right to be represented, if he so chooses, by an attorney who has no conflict of interest. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Williams v. Meachum,* 948 F.2d 863, 866 (2d Cir.1991); *United States v. Curcio,* 680 F.2d at 885. Nonetheless, a defendant may "choose to give up this right to an 'attorney of undivided loyalty in order to retain the attorney of his choice,' another right guaranteed by the Sixth Amendment." *Williams v. Meachum,* 948 F.2d at 866 (quoting *United States v. Curcio,* 680 F.2d at 885). In *United States v. Curcio,* 680 F.2d 881, we established procedures to be followed in situations in which a defendant states that he desires to waive

his right to representation by an attorney who has no potential conflict of interest. We stated that the trial court should (1) advise the defendant of his right to conflict-free representation, (2) instruct the defendant as to the dangers arising from the particular conflict, (3) permit the defendant to confer with his chosen counsel, (4) encourage the defendant to seek advice from independent counsel, (5) allow a reasonable time for the defendant to make his decision, and (6) determine, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risks and freely chooses to run them. *Id.* at 888–890. The ultimate goal of these procedures is to permit the court to determine whether the defendant's waiver of his right to conflict-free counsel is knowing and intelligent. *Id.* at 888. Thus, "[i]n reviewing a defendant's waiver, ... we are ultimately concerned less with the exact words used by the trial judge than with whether the facts and circumstances of the case indicate that the defendant fully appreciated his situation and made a properly informed decision." *Williams v. Meachum,* 948 F.2d at 867; *see United States v. Jenkins,* 943 F.2d 167, 176 (2d Cir.), *cert. denied,* ⎯ U.S. ⎯, 112 S.Ct. 659, 116 L.Ed.2d 751 (1991). Further, though it would seem preferable for the defendant to take time to ponder his options or to consult with independent counsel, a prompt response does not invalidate his waiver if "there is no sign that the defendant lack[s] full comprehension of what he [is] doing." *Williams v. Meachum,* 948 F.2d at 867.

█ In the present case, the district court substantially followed the prescribed procedures. It advised Rodriguez of the potential dangers arising from Lopez's conflict of interest; it clearly spelled out for Rodriguez the worst-case scenario of how the conflict could conceivably affect Lopez's representation of him; it repeatedly informed him that, if he wished, he could be provided with separate counsel, either to replace Lopez, or simply to advise him on whether he should waive his right to conflict-free counsel. Though most of his responses were "Yes" or "No," and though

Rodriguez made his decision almost immediately after the court informed him of his options, the proceedings left no doubt that he understood that he could have independent counsel to advise him ("Yes, I could, yes." Sealed Tr. 11–12), and that he did not wish to do so ("No, I don't want to consult about anything with any other attorney." *Id.* at 12).

In light of all the circumstances, the district court did not err in finding that Rodriguez's decision to waive conflict-free counsel was knowing and intelligent. Our review of the sealed transcript persuades us that no remand is warranted.

### 2. The Extent of the Upward Departure in Sentencing

█ In sentencing Rodriguez to a 360-month term of imprisonment, the court departed upward by six levels from the offense level prescribed by the applicable version of the Guidelines. Rodriguez contends that the sentence should be vacated and the matter remanded for resentencing because the district court failed to consider explicitly, and state its reasons for rejecting, each interim level in accordance with *United States v. Kim,* 896 F.2d 678. We disagree.

In *United States v. Kim,* we stated that when the sentencing court is considering an upward departure under Chapter 5, Part K, of the Guidelines,

> the judge should consider the next higher [offense] levels in sequence to determine if they adequately reflect the seriousness of the defendant's conduct. Doing so will afford the judge an opportunity to compare the defendant's conduct, with its aggravating circumstances, to the type of conduct for which the Commission has prescribed more severe punishment.

*United States v. Kim,* 896 F.2d at 685. *See also United States v. Pergola,* 930 F.2d 216, 220 (2d Cir.1991) ("the sentencing court should make clear on the record that it has considered lesser departures than the one eventually arrived at"); *United States v. Coe,* 891 F.2d 405, 412–13 (2d Cir.1989) (explanation required with respect to

Guidelines Ch. 4, Part A increase in criminal history category). *Kim* and its progeny were not, however, intended to be a straitjacket; the objective is to have the "judge ... compare the defendant's conduct, with its aggravating circumstances, to the type of conduct for which the Commission has prescribed more severe punishment." *United States v. Kim*, 896 F.2d at 685. The fundamental premise is that when conduct not taken into account by the Guidelines provisions applicable to the defendant provides the basis for an upward departure, the court should not arrive at a sentence that exceeds the penalty that would have been imposed had the defendant been sentenced under other Guidelines provisions that do take the same or similar conduct into account. This goal is accomplished when the court looks to analogous Guidelines provisions to determine the extent of the departure. Thus, "the point of *Kim* is to use ... the sentencing table as useful guidance in determining the extent of a departure, not to precipitate a time-consuming analysis of every possible calculation of arguably relevant circumstances." *United States v. Baez*, 944 F.2d 88, 89 (2d Cir.1991). The sentencing here met that objective.

 Rodriguez's continuing criminal enterprise offense, as charged in the indictment, was committed from 1988 to July 1989. Though Rodriguez was not sentenced until March 1991, the district court properly concluded that the November 1, 1987 version of the Guidelines ("1987 Guidelines"), *i.e.*, the version in effect at the time the offense was committed, applied. In the 1987 Guidelines, § 2D1.5 established a flat offense level of 36 for a defendant convicted of heading a continuing criminal enterprise, regardless of the size of the organization or the quantity of narcotics sold. The commentary to that section provided, however, that if "the quantity of drugs substantially exceeds that required for level 36 in the drug quantity table, or if the number of persons managed by the defendant is extremely large," an upward departure might be warranted. Guidelines § 2D1.5 Application Note 2. In contemplating the sentence to

be imposed on Rodriguez, the district court noted that a level of 36 corresponded to the sale of only a half-kilogram of crack, and that "[t]he offense in this case involved over 100 times that." (Sentencing Transcript dated March 7, 1991 ("Sent. Tr."), 25–26). The court concluded that that offense level was inadequate to reflect the nature of Rodriguez's crime and that it was "clear that the circumstances therefore warrant[ed] an upward departure as contemplated by" the commentary to § 2D1.5. (Sent. Tr. 26.)

By the time Rodriguez was sentenced in March 1991, the Guidelines had been amended. In the November 1, 1989 version, § 2D1.1, the drug quantity table, set an offense level of 42 for quantities of crack in excess of 15 kilograms. The court chose to look to this then-current version as "[t]he best guide for the degree of departure." (Sent. Tr. 26.) Given Rodriguez's criminal history category, a 42 offense level yielded a sentencing range of 360 months to life imprisonment.

We conclude that the district court appropriately compared Rodriguez's conduct "to the type of conduct for which the Commission has prescribed more severe punishment," *United States v. Kim*, 896 F.2d at 685, by seeking guidance from the new drug quantity table provided by the Commission. A mechanical level-by-level review of the extent of the upward departure was unnecessary.

### 3. Rodriguez's Other Arguments

Rodriguez also contends (a) that he should have been allowed to withdraw his plea of guilty because it was entered in the erroneous belief that the government would dismiss the indictment against Pacheco, and (b) that the court erred in accepting his plea of guilty without forewarning him that it intended to depart upward from the Guidelines range of imprisonment. Neither argument has merit.

 A defendant has no absolute right to withdraw his plea of guilty. *United States v. Burnett*, 671 F.2d 709, 712 (2d Cir.1982); *United States v. Giuliano*, 348

F.2d 217, 221 (2d Cir.), *cert. denied,* 382 U.S. 946, 86 S.Ct. 406, 15 L.Ed.2d 354 (1965). He bears the burden of persuading the trial court that valid grounds for withdrawal exist, and the district court's decision to deny a motion to withdraw a guilty plea will be reversed only if its factual findings are clearly erroneous, *see United States v. Marquez,* 909 F.2d 738, 740 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), or the denial is an abuse of discretion, *see United States v. Figueroa,* 757 F.2d 466, 475–76 (2d Cir.), *cert. denied,* 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985).

■ In his plea allocution, Rodriguez gave no indication that he was pleading guilty in order to secure favorable treatment for Pacheco. Rather, he stated that he "want[ed] to plead guilty to get this over with." (Second (Unsealed) Plea Hearing Transcript dated February 27, 1990, at 9). In response to questioning by the court, he stated that he had read and understood the terms of the written plea bargain agreement. He was asked whether anyone had made any other promises to him in connection with sentencing, and he answered in the negative. Remarking on that colloquy and noting that Rodriguez did not, in connection with his motion to withdraw his plea, claim his innocence of the charge to which he had pleaded guilty, the court denied the motion to withdraw the plea. The court's findings were not clearly erroneous and we see no abuse of discretion in its denial of the motion.

■ Rodriguez's lack-of-notice argument has no greater merit. Fed.R.Crim.P. 11 required the court to advise Rodriguez of the maximum sentence he faced and to advise him generally about the Guidelines. *See, e.g., United States v. Perdomo,* 927 F.2d 111, 116 (2d Cir.1991); *United States v. Fernandez,* 877 F.2d 1138, 1142–44 (2d Cir.1989). In addition, we have held that before departing upward from the Guidelines sentencing range, the court must give the defendant notice and an opportunity to contest the intended departure. *United States v. Colon,* 905 F.2d 580, 584 (2d

Cir.1990); *United States v. Palta,* 880 F.2d 636, 640 (2d Cir.1989).

The district court met these obligations. At the plea hearing, it informed Rodriguez of the minimum and maximum sentences provided in the statute. After advising Rodriguez that the imprisonment range recommended by the Guidelines was unclear, the court informed him that even after that range is determined, the court has the authority in some circumstances to impose a sentence that is more severe; and it informed him that if a more severe sentence than he expected were imposed, he would still be bound by his plea. Rodriguez responded that he understood. Subsequently, one month prior to sentencing, the court advised both sides in writing that it was considering whether an upward departure, in light of the vast quantity of cocaine sold, might be appropriate. No more was required.

### C. *Other Arguments*

The other appellants make a variety of additional arguments, challenging, *inter alia,* the lawfulness of a search and seizure, a number of the trial court's evidentiary rulings, certain parts of the government's summation, and various aspects of sentencing. We have considered all of the arguments and have found them to be without merit. Only the following warrant discussion.

#### 1. The Summation Speculation as to the Role of Garcia

■ The indictment alleged that Garcia was a supplier of cocaine to the Organization; the government's opening statement reiterated that theory. One of the intercepted conversations introduced at trial, however, reflected a delivery by Garcia to Rodriguez of a substantial sum of money. In summation, the Assistant United States Attorney ("AUSA") speculated that Garcia might also on occasion have been a purchaser of narcotics from Rodriguez. Garcia contends that he was denied a fair trial by this statement because it changed the government's theory of his role in the conspiracy and permitted the jury to find him

guilty of conduct with which he was not charged. We are unpersuaded.

Improper remarks during summation "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); *see United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). "Whether a prosecutor's improper statement during summation results in a denial of due process depends upon whether the improper statement causes substantial prejudice to the defendant." *Id.* It is a "rare case" in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required. *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir.1990).

In the present case, the trial court properly labeled the AUSA's characterization of Garcia as a buyer as speculation. The court directed the jury to disregard it, reminded the jury that there was no charge in the indictment as to any sales by Rodriguez to Garcia, and instructed the jury to focus on the evidence that was relevant to the charges that were made in the indictment. There was substantial evidence to support the conviction of Garcia for his role in the conspiracy as alleged in the indictment, and any possible prejudice from the AUSA's speculation in summation was adequately dispelled by the court's curative instruction.

2. The Purse of Pacheco

At trial, New York City Police Detective Scott Fowler described his execution of a November 10, 1988 search, pursuant to a warrant, of Cots's apartment in the building from which the Organization made most of its retail sales. Fowler stated that he had found, *inter alia*, a woman's pocketbook on the table in the kitchen of the apartment and had asked Organization member Aurea Rodriguez, who was in the apartment at the time of the raid, about the purse. Fowler testified that in the purse was an identification ("ID" or "I.D.") card:

Q. Do you recall what the ID card said on it?

A. Just one name that was on the ID.

Q. And what name do you recall?

A. Maria (Pronounced MAR–EYE–A by witness).

(Trial Transcript ("Trial Tr.") 537.) Neither the purse nor the ID card was seized.

Aurea Rodriguez testified that just prior to the raid, she had seen Pacheco in the kitchen of Cots's apartment. She also testified that Fowler asked her about the purse, which she denied was hers, and then showed her an ID bearing a picture. She testified, over Pacheco's objection, that the woman in the picture was Pacheco:

Q. Did the officers show you anything?

A. Yes.

Q. What did they show you?

A. They show [*sic*] me an I.D.

Q. And can you tell us what the I.D. looked like?

A. It had a picture on it.

Q. Do you know whose picture it was?

MR. VERDIRAMO [Pacheco's attorney]: Objection, unless the Government intends to produce the identification here.

THE COURT: Overruled.

Q. Do you know whose picture it was?

A. Yes.

Q. Whose picture was it?

A. It was Mirella's picture.

Q. Mirella who?

A. Pacheco.

(Trial Tr. 2869–70.) In summation, the government cited the testimony of Fowler and Aurea Rodriguez and referred to the purse as belonging to Pacheco.

Pacheco argues that she was unfairly prejudiced by the summation's attribution of the purse to her because, *inter alia*, neither the purse nor the ID had been admitted in evidence, because Fowler had stated that the ID was for a person whose name he pronounced "Mar-eye-a," not "Mirella," and because on cross-examination Aurea Rodriguez "admitted that the identification card she claimed to have seen nev-

er existed" (Pacheco brief on appeal at 21). We are unpersuaded.

■■■ It is the responsibility of the trial court to make a preliminary assessment of the reliability of proffered evidence, see Fed.R.Evid. 104(a), and its evidentiary rulings are reviewed generally for abuse of discretion, see, e.g., *Healey v. Chelsea Resources Ltd.*, 947 F.2d 611, 620 (2d Cir.1991). The fact that a physical object is not available does not require the exclusion of relevant oral testimony describing the object if the court is persuaded that the witness has the requisite personal knowledge, see Fed.R.Evid. 602. The result of a witness's observations need not be positive or absolutely certain to make his testimony admissible, *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir.1973); 2 J. Wigmore, *Evidence* § 658, at 894–896 (Chadbourn rev. ed. 1979), and lack of certainty is a matter to be argued to the jury rather than a reason for excluding the evidence. The government is entitled, in summation, to argue all inferences that may permissibly be drawn from the evidence admitted. *See, e.g., United States v. Nersesian*, 824 F.2d at 1327.

■■■ The purse and the ID were not available for introduction at trial because they had not been seized in the November 10, 1988 raid. There was no error in the court's permitting Fowler, who had personally seen those objects, to describe them. Further, though the record is less clear than perhaps it should be, the fact that Fowler pronounced the name on the ID card "Mar-eye-a" did not mean that he had not seen the name "Mirella." There is no confirmation in the transcript that the name Fowler had seen was spelled "Maria" as the court reporter spelled it. Had Fowler himself spelled the name "Maria," we would have expected the trial judge, if presented with no evidence to equate "Maria" with "Mirella," to uphold an objection by Pacheco to Fowler's ID testimony on the ground of relevance. However, Fowler did not recall precisely how the name was spelled. In the present case, any doubt that the name that actually appeared on the ID was "Mirella" was reduced, if not

eliminated, by the testimony of Aurea Rodriguez, who knew and worked with Pacheco, and who testified that the ID was that of Mirella Pacheco.

■■■ Finally, we reject Pacheco's contention that Aurea Rodriguez's testimony did not provide a basis for the government to argue in summation that the ID and purse belonged to Pacheco. Aurea Rodriguez's testimony on direct examination, quoted above, was unequivocal. On cross-examination, Pacheco's attorney asked Aurea Rodriguez whether the government had shown her the purse or the ID when it showed her documents and "the evidence in this case" in "debrief[ing]" her; upon receiving "No" answers, he asked if it was not true that "there is no purse, there is no identification and there is no picture," to which Aurea Rodriguez responded "Yes." (Trial Tr. 3255.) This response, to questioning that seemed to focus on her trial preparation for the present prosecution, rather than on what she was shown at the time of the November 10, 1988 raid, hardly warrants Pacheco's assertion that Aurea Rodriguez "admitted that the identification card she claimed to have seen never existed." In any event, any conflict in her testimony went to the weight to be accorded her unequivocal statement that the ID had Pacheco's name and picture on it, not to the admissibility of that statement.

In sum, we find no error in the court's admission of the testimony of Fowler and Aurea Rodriguez nor any impropriety in the government's argument on summation that the purse and ID belonged to Pacheco.

## CONCLUSION

The judgments of conviction are affirmed.

MESKILL, Circuit Judge, concurring:

I write separately because I do not agree with the majority's treatment of the wiretap issue, which effectively repeals 18 U.S.C. § 2518(3)'s requirement that a judge may only enter an order authorizing the interception of communications "within the territorial jurisdiction of the court in which

the judge is sitting." I concur in the result reached by the majority, however, because, under the circumstances of this case, suppression of the evidence is not mandated by 18 U.S.C. § 2515.

Under the majority's interpretation of the statute any federal district court, circuit court of appeals or appropriate state court may authorize a wiretap any place in the country. A judge in the Southern District of New York may now authorize a tap on a phone in Chippewa Falls, Wisconsin, Nome, Alaska or Prescott, Arizona, even if no calls are ever placed to the east coast, as long as the listening post is set up in Manhattan. *See, e.g., United States v. Burford,* 755 F.Supp. 607, 609–11 (S.D.N.Y. 1991) (holding that judge in Southern District of New York could authorize wiretap in Maryland). Law enforcement officials are now able to shop, free from territorial constraints, for a judge who would be likely to authorize a wiretap. *Cf. Castillo v. State,* 810 S.W.2d 180, 184 (Tex.Crim.App. 1990) (in banc) (interpreting parallel state statute to prohibit judge shopping). If a judge in one district denies authorization, law enforcement officials may simply move their listening posts to another jurisdiction until they find a judge willing to authorize the wiretap.

The majority accomplishes this result by holding that a single captured communication is "intercepted" in more than a single jurisdiction, and that authorization in any one such jurisdiction is sufficient to satisfy Title III. While I agree that a federal court sitting in the jurisdiction in which the telephone to be tapped is located has authority to authorize a wiretap, I cannot join the majority in holding that the unilateral decision of law enforcement agents as to where to set up their listening post can grant authority to a judge in any jurisdiction to authorize a phone tap in any other jurisdiction. I do not believe that the conversations from the Imperio Cafe in New Jersey were "intercepted" in Manhattan.

The heart of the definition of "intercept" in 18 U.S.C. § 2510(4) is the "acquisition of the contents" of a communication. The contents of the Imperio Cafe communications were *acquired* by law enforcement officials when they were diverted in New Jersey. In Manhattan the *previously acquired* contents were transformed into sound, but, because they were already within the control of the law enforcement agents, they were not newly "acquired." I do not believe that the contents of a communication become acquired anew each time they are transformed into a different medium.

The phrase "aural or other" in the definition of "intercept" does not justify the result reached by the majority. "Aural" was originally included in section 2510(4) principally to place devices such as pen registers and trap and tracing mechanisms (which do not capture the sounds of a conversation) outside the scope of Title III. *See* S.Rep. No. 1097, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2178 ("The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' for example, would be permissible."); *see also Castillo,* 810 S.W.2d at 184 (This " 'language, identical to that in the federal statute, is apparently intended [only] to impose no limitation upon the use of devices such as pen registers that enable law enforcement officers to determine the numbers called from a telephone but not to orally [sic] acquire the "contents" of conversations.' ") (interpreting state statute) (citation omitted). That some courts interpreted "aural" to mean that the territorial jurisdiction requirement of section 2518(3) applied to the place where the communications were first heard, *see, e.g., Evans v. State,* 252 Ga. 312, 314 S.E.2d 421, 423–26 (Ga.) (per curiam), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), was at most an unintended artifact of the structure of the statute.

In 1986, Congress amended that structure. Pen registers and tracing devices were separately regulated, *see* 18 U.S.C. § 3121 *et seq.,* and the definition of "contents" in Title III was narrowed so that those devices would no longer even arguably be included in the statute. *See* S.Rep. No. 99–541, 99th Cong., 2nd Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News

3555, 3567–68 (discussing amendment to the definition of "contents"). This allowed Congress to expand the definition of "intercept" to protect the increasingly common non-verbal communications by altering "aural acquisition" to "aural or other acquisition" without bringing pen registers and tracing devices within the ambit of Title III.

Nothing in the legislative history suggests any intent to affect the territorial jurisdiction requirement of section 2518(3), either by originally including the term "aural" or by subsequently adding "or other." I do not believe that Congress ever enacted a "principle that the place where the contents of a wire communication are first to be heard and understood by human ears ... is the situs of an interception." Maj. Op. at Part II.A.2. Although prior to the 1986 amendment a literal reading of the statute might have resulted in the necessity to seek authorization in the place where the captured communication was first heard, there is no reason to believe that Congress intended such a result. Since the 1986 amendment, that unintended result is no longer required by the words of the statute.

The majority justifies its reading of the statute on policy grounds. The majority reasons that "[i]f all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided." I am not sure that this is necessarily true, but even if unified authorization (which is not mandated under the majority opinion) does tend toward tighter control of law enforcement activities, it is also true that judges may be more hesitant to authorize excessive interceptions within their territorial jurisdiction, in their own back yard so to speak, than in some distant, perhaps unfamiliar, part of the country. Congress determined that the best method of administering wiretap authorizations included a territorial limitation on the power of judges to make such authorizations and this Court should be bound by that determination.

Even though I believe that Judge Leisure, sitting on the United States District Court for the Southern District of New York, did not have the power to authorize the wiretap of the New Jersey telephone, I concur in the result reached by the majority because I do not believe that Title III requires suppression of the evidence in this case. Suppression of certain intercepted communications is mandated by 18 U.S.C. § 2515. Significantly, however, that statute does not exclude all evidence obtained in violation of Title III:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... before any court ... *if the disclosure of that information would be in violation of this chapter.*

18 U.S.C. § 2515 (emphasis added). Disclosure of the contents of intercepted communications is prohibited by 18 U.S.C. § 2511(1)(c), which provides criminal and civil penalties for any person who discloses "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." At the time of trial, the government, having obtained the communications pursuant to court authorization, neither knew nor had reason to know that the information had been obtained in violation of Title III. Disclosure thus was not prohibited by section 2511(1)(c). Therefore, suppression was not required under section 2515.

I agree with the majority's treatment of all of the other issues in this appeal and in the result reached by the majority.