# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1894

_____

United States of America

*Plaintiff - Appellee*

v.

Dominic Henley, also known as Bishop

*Defendant - Appellant*

_____

No. 13-1935

_____

United States of America

*Plaintiff - Appellee*

v.

James C. Smith, also known as Animal

*Defendant - Appellant*

_____

No. 13-1941

_____

United States of America

*Plaintiff - Appellee*

v.

Jerry Elkins

*Defendant - Appellant*

_____

No. 13-1967

_____

United States of America

*Plaintiff - Appellee*

v.

Marshall Fry, also known as Bo, also known as Big Bo

*Defendant - Appellant*

_____

No. 13-1969

_____

United States of America

*Plaintiff - Appellee*

v.

Anthony Robinson, also known as Blade

*Defendant - Appellant*

_____

No. 13-1971
_____

United States of America

*Plaintiff - Appellee*

v.

Jerry Peteet

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: June 11, 2014
Filed: September 10, 2014
_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.
_____

MURPHY, Circuit Judge.

Defendants Dominic Henley, James C. Smith, Jerry Elkins, Marshall Fry, Anthony Robinson, and Jerry Peteet were charged with racketeering conspiracy, and various counts of violent crime in aid of racketeering in connection with their involvement with the Wheels of Soul, an outlaw motorcycle gang. Each man pled not guilty. As the case proceeded to trial, a number of the defendants filed motions to suppress evidence obtained through electronic surveillance during a lengthy

government investigation. After evidentiary hearings, a magistrate judge[1] issued a report and recommendation denying the motions, which was adopted by the district court.[2] At the thirty five day jury trial over sixty witnesses testified. The government sought to prove that the defendants had conspired to murder members of rival motorcycle clubs. During trial the district court denied various evidentiary motions and motions for judgments of acquittal. After eight days of deliberation the jury returned guilty verdicts on the racketeering conspiracy charges for each defendant, and on many of the substantive charges, and the defendants appeal. We affirm.

I.

A.

Near the end of 2008 Andria Van Mierlo, a St. Louis County police officer and member of an FBI task force, sought information about a St. Louis motorcycle club known as the Sin City Disciples (alternatively "Desciples" or "Deciples"). A defense lawyer who learned of her interest in the organization introduced her to Matthew Hunter, one of his clients. Hunter had been charged with evading arrest after he attempted to flee from the police on a motorcycle. While he was not a member of the Sin City Disciples, he was familiar with the group through some acquaintances. Officer Van Mierlo met with him and offered to pay him to serve as an informant in the government's investigation of the Disciples. He agreed after some deliberation. At the direction of officer Van Mierlo, Matthew Hunter joined the St. Louis chapter of the Sin City Titans, a group affiliated with the Disciples.

---

[1] The Honorable Frederick R. Buckles, United States Magistrate Judge for the Eastern District of Missouri.

[2] The Honorable Catherine D. Perry, Chief United States District Judge for the Eastern District of Missouri.

In early 2009 a dispute arose in the national Sin City organization and five St. Louis members of the motorcycle club, including Matthew Hunter, left it and formed a St. Louis chapter of a rival group called the Wheels of Soul. The Wheels of Soul is a longstanding "outlaw motorcycle club" with headquarters in Philadelphia, Pennsylvania and chapters throughout the country. Its members explained at trial that as an "outlaw" club, they "live[d] beyond the law" and sought to assert control over other motorcycle clubs within the same geographic area.

The Wheels of Soul has a national structure organized around regional and local chapters. The newly formed St. Louis chapter became a part of the Midwest region, which included chapters in Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. Each local chapter of the Wheels of Soul held regular meetings in addition to occasional regional and national meetings. Some chapters also maintained a local clubhouse. Individual members were expected to pay monthly dues which covered local expenses and also supported the "mother chapter" or national office.

The Wheels of Soul had a written constitution that provided for the election of national officers, including a president, vice president, sergeant at arms, secretary, and treasurer. Similar positions existed at the local and regional level. Local and regional presidents were responsible for leading meetings, determining dues and fines, and communicating with the "mother chapter" in Philadelphia. The sergeant at arms was responsible for protecting the chapter president, keeping order at meetings, securing the group's clubhouse space, and "mak[ing] sure out in public that the chapter members were safe." The treasurer was responsible for managing dues, and the secretary kept notes at meetings. Some chapters also had a business manager who was responsible for organizing parties to raise funds.

The Wheels of Soul constitution specified that the object of the organization was "to inform, to ride motorcycles, and to advance the interest of [its] members."

The national leadership emphasized secrecy and loyalty, stating that "Wheels of Soul business is not spoken outside Wheels of Soul membership," and reminding its members that people involved with other motorcycle clubs should be considered "your enemy." Officers could discipline members for violations of the organization's internal rules and customs, such as insubordination or absence at required meetings or events. Members could also be disciplined for failure to support each other in dangerous situations. At one meeting the national vice president, defendant James C. Smith, alluded to the consequences of failing to provide support by stating, "[w]e will bleed for you, we will die for you, but I can tell you point blank . . . [i]f I'm out there and I got a motherfucking situation and you leave me, you better hope to God that I don't survive."

Members of the Wheels of Soul distinguished themselves from rival outlaw clubs such as the Sin City Disciples, Hell's Lovers, and Outkasts by wearing vests embellished with identifying patches. These were referred to as the club's "colors," and such patches carried special significance in the motorcycle club community. For example, a "bottom rocker" patch identified a specific geographic territory and a "diamond" or "one percent" patch showed that the group was an outlaw club at "the top of the food chain." Such patches could only be worn by the outlaw club in control of the relevant area and by members who met certain qualifications. Breaching these rules could have consequences. For example, wearing a "bottom rocker" without the permission of the leading "outlaw club" in the state was considered a sign of disrespect. Disputes over the wearing of these patches often resulted in physical violence.

The government's investigation of the Wheels of Soul spanned several years, and Matthew Hunter's cooperation was central to it. As part of his agreement with officer Van Mierlo, Matthew Hunter agreed to wear concealed electronic devices that could surreptitiously record his conversations with other individuals and to the

monitoring and recording of his telephone conversations. These recordings were downloaded and maintained by FBI personnel over the course of the investigation. During the course of his cooperation Matthew Hunter also participated in several controlled purchases of weapons and drugs, purchases which were monitored and recorded by FBI personnel.

As the investigation progressed, the government also sought to intercept the phone calls of the Midwest regional president, Allan Hunter.[3] On January 10, 2011, Judge Henry E. Autrey of the Eastern District of Missouri authorized the government to place a wiretap on a cellphone used by Allan Hunter. Judges Audrey G. Fleissig and E. Richard Webber of the Eastern District of Missouri also issued orders authorizing the continued interception of calls (orders entered February 9, 2011 and March 10, 2011). These interceptions ceased on Friday, April 8, 2011, and Judge Jean C. Hamilton sealed the wiretap on Thursday, April 14, 2011.

The government's investigation led to an indictment on June 9, 2011 charging eighteen defendants. A superseding indictment was returned on June 21, 2012 against eleven defendants (after some of the original defendants pled guilty and several others were added). Among the defendants named in the superseding indictment were: James C. Smith, the national vice president; Dominic Henley, the president of the St. Louis chapter; Jerry Elkins, the president of the Denver chapter; Marshall Fry, a member of the Denver chapter; Anthony Robinson, the sergeant at arms of the Chicago chapter; and Jerry Peteet, the president of the Indiana chapter. The superseding indictment charged seventeen counts including racketeering conspiracy and other offenses which allegedly demonstrated a "pattern of racketeering activity," including murder, attempted murder, robbery, and conspiracy to commit murder.

---

[3] Allan Hunter and informant Matthew Hunter are not related.

Before trial defendants Henley, Smith, Elkins, and Robinson each filed a motion to suppress the contents of the electronic surveillance, including but not limited to conversations obtained through the judicially authorized wiretap of the cellphone used by Allan Hunter. The magistrate judge held a hearing on these motions on April 5, 2012, and issued a report and recommendation denying each of them on September 28, 2012. After reviewing the briefs, the transcript of the hearing, the original wiretap applications, and the defendants' objections, the district court adopted the magistrate judge's report and recommendation and denied the motions to suppress. In addition to ruling on many other pretrial motions, the district court denied defendant Smith's motion to sever his case and defendant Robinson's motion in limine to exclude evidence of an uncharged murder in November 2009. The district court also granted the government's motion in limine to exclude an affidavit from a man named Barry Rogers, which defendant Peteet wanted to admit in lieu of Rogers' live testimony.

The case proceeded to trial on October 15, 2012. Over the course of the thirty five day trial the government presented evidence of numerous acts of violence involving the defendants. Incidents relevant to this appeal are described in the next sections.

B.

On May 28, 2009, a Sin City Disciples member named Robert Taylor was shot in the buttocks in the parking lot of a Bennigan's restaurant in Gary, Indiana. Taylor testified at trial that he had been shot by defendant Jerry Peteet, a former member of the East Chicago chapter of the Sin City Disciples who had joined the Wheels of Soul in early 2008. At the time of the Bennigan's incident Peteet was the president of the Wheels of Soul chapter in Indiana.

According to Taylor's account, he was at Bennigan's picking up some food when Peteet arrived with several people who were wearing the Wheels of Soul colors. A fight broke out over an unpaid debt between Taylor and one of these men, and Taylor tried to leave. Taylor testified that he was followed to the parking lot, where the disagreement continued. During this argument Peteet walked up to Taylor, "pistol-whipped" him in the head, pointed two guns at his chest, and stated "I will kill you right here." Taylor stated at trial that as he turned to walk towards his friend's car, Peteet fired twice, causing his injury.

In addition to Taylor's testimony, the government introduced a 911 call made by Taylor to report the shooting and naming "Jerry Peteet" as the shooter. Peteet confirmed at trial that he had pointed two guns at Taylor while in the parking lot, but stated that another Wheels of Soul member had been the shooter. The government introduced the contrary testimony of a Bennigan's security guard who had witnessed the incident and later identified Peteet as the shooter in a photographic lineup. There was also a positive identification by Taylor's friend who had witnessed the shooting from a nearby car. Matthew Hunter testified that after the Bennigan's incident in Gary, "issues" between Sin City and the Wheels of Soul "filtered down to St. Louis." Another witness testified that after the shooting the Wheels of Soul "was supposed to be at war" with the Sin City organization.

C.

On August 10, 2009, two members of a motorcycle club known as the STL Riders had their colors stolen at gunpoint at a bar in St. Louis. The government introduced evidence that defendant Dominic Henley, president of the St. Louis chapter of the Wheels of Soul, held a chapter meeting earlier that day at which he instructed members to assert their dominance over other motorcycle clubs in the city. Henley admitted at trial that he had told members at the meeting that "[i]f we tell

-9-

somebody to do something, we have to back it up, whatever we're ordering them to do." Following the meeting Henley, informant Matthew Hunter, and several other Wheels of Soul members went to a local bar where they encountered Joshua and Constance Polk who were wearing the colors of the STL Riders. According to Matthew Hunter, Henley instructed the Wheels of Soul members to take off the Polks' colors because the STL Riders did not have permission to wear them. The group confronted the couple who attempted to retreat. A Wheels of Soul member then threatened them with a .38 caliber revolver, and the Polks surrendered their vests.

In addition to the Polks' testimony about the events that night, the government introduced evidence from a police report in which the couple had provided a license plate number for a Harley Davidson motorcycle they thought was connected to one of the Wheels of Soul members involved. The license plate the Polks provided was "AVCGK"; Henley owned a motorcycle with the license plate "AV6GK." The Polks separately viewed photographic lineups shortly after the incident, and both identified Henley. Later the Polks also identified Henley in an in person lineup. In addition Matthew Hunter had immediately reported the incident to officer Van Mierlo, informing her that he had possession of one of the seized vests.

D.

On November 1, 2009 an off duty correctional officer was murdered outside a Chicago nightclub. While no one was ever charged with the murder, the government introduced evidence at trial that defendant Anthony Robinson, sergeant at arms of the Chicago chapter, had shot the officer from the backseat of a moving car. Allen Hunter testified that he had attended a party that night with Robinson and other Wheels of Soul members. He reported that at the party a friend of the Wheels of Soul members had gotten into a fight with a member of the Brothers Keepers organization. After the party Myron Farris, at that time the Midwest regional

-10-

president for the Wheels of Soul, went to his garage and retrieved a shotgun which he gave to Robinson. According to Allan Hunter's testimony the group then split into four cars and went searching for members of the Brothers Keepers. Robinson rode in the back seat of Hunter's car. When he spotted a man approaching a nightclub who was wearing a Brothers Keepers vest, he instructed Hunter to pull away while he fired the shotgun out the window. Robinson told Hunter as they drove away that his shot had hit the man.

While Allan Hunter's trial testimony was the government's primary evidence about this shooting, the government also introduced recordings of several phone calls between Robinson, a woman named "Rain," and Allan Hunter made while Robinson was incarcerated at the Cook County Jail in Chicago. In these calls Robinson warned the others that he had been questioned by the government about the shooting and urged them to "get the fuck rid" of anything "that can tie us to anything."

E.

On January 2, 2011, both a member of the Street Soldiers outlaw motorcycle club and a member of the Wheels of Soul were shot and killed at a clubhouse in Chicago. The government introduced evidence that defendant Robinson was one of the shooters. A man named Charles Ervin testified at trial that he went to the Chicago clubhouse that night wearing his Street Soldiers colors, which bore a "bottom rocker" reading "Illinois." Members of the Wheels of Soul, including defendant Robinson, saw Ervin at the clubhouse and called regional president Allan Hunter to ask whether they should take action to remove his colors. Allan Hunter testified that a few months earlier he had attended several meetings with the leadership of the Street Soldiers to discuss that organization's entrance into Chicago and their right to wear an "Illinois" bottom rocker. Since these discussions had ended without a resolution, Allan Hunter told Robinson that he would "take care of it later."

-11-

Ervin and his friend Carl Davis testified, however, that later that evening Robinson and other Wheels of Soul members had surrounded them, displayed weapons, and demanded Ervin remove his colors. The confrontation quickly escalated into a gunfight, during which two individuals were shot. Ervin testified that he was carrying a .45 caliber Glock at the time, that he fired it, and later discarded it in an alleyway. The police recovered the weapon that night in a vacant lot next to the Chicago clubhouse, as well as a number of .45 shell casings found on the floor inside. At trial the government also introduced .40 shell casings recovered from the body of one of the victims and the floor of the scene, a .40 caliber Smith and Wesson handgun that matched those bullets, and video footage of defendant Robinson selling this handgun to informant Matthew Hunter six days after the incident. Two witnesses corroborated Ervin's account at trial, both stating that they saw a group of four or five people surround a man sitting at the bar and that some of them were wearing Wheels of Soul colors. One of the witnesses also overheard the group use the word "rocker" shortly before shots were fired.

On January 17, 2011, the Wheels of Soul convened a national meeting in Philadelphia. Defendant Smith presided over the meeting, at which he told the chapter presidents that the Wheels of Soul was in "a full-on war" with the Street Soldiers and Outcast motorcycle clubs. A former president of the Wisconsin chapter of the Wheels of Soul, Walter Lee, testified that the shooting on January 2 was discussed at the meeting and that he understood that that shooting had caused the war with the Street Soldiers.

F.

On January 29, 2011, defendants Fry and Henley, along with other members of the Wheels of Soul, attended a "Black New Years" party in St. Louis. The government introduced evidence at trial of a Wheels of Soul plan to shoot members

of the Outcast motorcycle club attending this party. Included in this evidence were recordings of conversations between defendant Elkins, who was the Denver chapter president at the time, and regional president Allan Hunter. These conversations indicated that Elkins was sending a couple members of the Denver chapter to St. Louis to attend the party and "take care of business." Allan Hunter later testified that the plan was to shoot members of Outcast at the party since there was a "war" between the two clubs. Numerous intercepted communications reveal Elkins unsuccessfully trying to convince informant Matthew Hunter to attend the New Years party. Elkins also asked regional president Allan Hunter who was available to attend and had access to weapons.

Ultimately Wheels of Soul members Jamal Brandon, Walter Lee, and defendants Henley and Fry attended the Black New Years party. Lee and Allan Hunter were in contact much of the night; the government introduced a recording in which Hunter asked Lee if he was "prepared." Lee later testified that he understood this to be a question about whether he was armed. Lee also contacted Allan Hunter that evening to report that defendant Henley was intoxicated. Hunter responded by calling Henley and telling him to leave the party, but Henley refused, stating that he had "talked to [Elkins]." When the Outcast members left the party that night, Fry sent a text message to Lee which indicated that he needed to get ready to "carry out the mission." Lee stated at trial that while he had not come to the party to participate in a hit, he felt at the time that he had to participate for fear that otherwise he would "get [his] ass stomped" at the next Wheels of Soul meeting. Lee testified that he then went with Fry, Brandon, and Henley to retrieve guns from their truck and that Henley said "[g]ive me a gun. I'll do it." When the group heard that Outcast had "disappeared," the plan was abandoned.

In a call recorded later that night, Elkins told Allan Hunter that "my peoples kinda pissed off right now" because Henley was intoxicated and needed "babysitting."

-13-

Allan Hunter told Lee over the phone that Henley "fucked it up for us," and Lee replied that he "was sittin' in there to snuff me a motherfucker out and if they'd a showed up, that's exactly what the fuck was fittin' to happen." The government also presented evidence of two phone calls the following month between Allan Hunter and national vice president Smith in which Hunter asked Smith if he had heard about what happened in St. Louis and reassured him that "I'm gonna deal with that next week, as far as the motherfucker that fucked it up." Hunter assured Smith that "I'm still tryin' to, you know, dig up . . . some power moves," and Smith replied "[a]lright bro, sounds good."

G.

On March 6, 2011 at a Midwest regional meeting in Marion, Ohio, Allan Hunter instructed other Wheels of Soul members to beat a fellow member as punishment for failing to participate in a fight. Later that evening a man was shot to death and another was grievously injured outside the Wheels of Soul Ohio clubhouse.

The government's evidence indicated that several fights broke out at the Wheels of Soul clubhouse between "civilians" who were invited to a party that evening and members of the Wheels of Soul club. One civilian testified at trial that he was beaten so severely at the party that he suffered a crushed eye socket, five broken ribs, and a broken bone in his back. Several witnesses testified that during the melee they heard multiple gunshots from the front of the clubhouse. Allan Hunter testified that after he heard the first round of gunshots he moved towards the front of the building. From there he saw Robinson and another man both firing guns out the front door. Informant Matthew Hunter was also at the party and testified that after he heard the first gunshots, he moved to an area at the front of the clubhouse where he saw Robinson start shooting out the front door. After this shooting Matthew Hunter tried to exit the clubhouse through the front door, but he testified that his way

-14-

was blocked by what appeared to be a dead body. Allan Hunter testified that later that night he saw Robinson wipe a gun he had with him, place it in a Taco Bell bag, and leave with it before returning without the package. Allan Hunter testified that he reported this incident to vice president Smith.

The police responded to the scene, where they found the two victims. They also found numerous bullet casings both outside and inside the front vestibule of the clubhouse, but no signs that shots had been fired towards the house from outside. The coroner found a bullet in the deceased victim's body and determined that the path of the bullet was consistent with a person having been shot in the back while running away. Later that month, road crew workers found a 9 millimeter Smith and Wesson bearing the serial number THB4479 in a storm drain. The police determined that the gun was a match for the 9 millimeter casings recovered from the clubhouse floor and the bullet recovered from the victim's body. In a later search of Robinson's apartment, police found a firearm magazine with the serial number THB4479 etched on the side.

H.

At the conclusion of the government's case in chief, the defendants each moved for a judgment of acquittal. Their motions were denied. The defendants renewed these motions at the close of all the evidence, but these were also denied. After deliberating for nearly eight days, the jury returned guilty verdicts against each defendant but acquitted individual defendants of some charges. Defendants Henley, Smith, and Robinson filed post verdict motions for judgments of acquittal which were denied. Appellants were convicted and sentenced as shown in the following chart:

| Defendant | Convictions (acquittals in parentheses) | Sentence |
|---|---|---|
| Dominic Henley (*President of the St. Louis chapter*) | 1) Racketeering conspiracy<br>2) Violent crime in aid of racketeering—conspiracy to commit murder<br>(*acquitted on two counts: murder and discharge of a firearm*) | 204 months |
| James C. Smith (*National Vice President*) | 1) Racketeering conspiracy | 120 months |
| Jerry Elkins (*President of the Denver chapter*) | 1) Racketeering conspiracy<br>2) Violent crime in aid of racketeering—conspiracy to commit murder | 210 months |
| Marshall Fry (*Member of the Denver chapter*) | 1) Racketeering conspiracy<br>2) Violent crime in aid of racketeering—conspiracy to commit murder<br>(*acquitted on one count: murder*) | 188 months |
| Anthony Robinson (*Sergeant at Arms of the Chicago chapter*) | 1) Racketeering conspiracy<br>2) Violent crime in aid of racketeering—murder<br>3) Violent crime in aid of racketeering—murder<br>4) Violent crime in aid of racketeering—attempt to commit murder<br>5) Tampering<br>(*acquitted on one count: attempted murder*) | Life without the possibility of parole |
| Jerry Peteet (*President of the Gary chapter*) | 1) Racketeering conspiracy<br>2) Violent crime in aid of racketeering—attempt to commit murder<br>(*acquitted on one count: tampering*) | 276 months |

II.

Appellants have appealed on numerous grounds, both jointly and as individuals. Appellants first challenge the sufficiency of the evidence supporting

their convictions, alleging that the district court erred in denying their motions for judgment of acquittal as to the racketeering conspiracy and as to various substantive counts. Our review on a sufficiency of the evidence challenge "is extremely deferential to the underlying guilty verdict and raises a high bar for a defendant to overcome." United States v. Wells, 646 F.3d 1097, 1102 (8th Cir. 2011). We will only reverse the denial of a motion for acquittal if "after viewing the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict." United States v. Beltz, 385 F.3d 1158, 1163 (8th Cir. 2004) (internal quotations and citations omitted). In reviewing a challenge to the sufficiency of the evidence, "witness testimony does not need to be corroborated," and "a jury's credibility determinations are virtually unreviewable." United States v. Perez, 663 F.3d 387, 391 (8th Cir. 2011) (internal quotations and citations omitted).

## A.

RICO makes it unlawful "for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), or to engage in any conspiracy to commit such an offense, 18 U.S.C. § 1962(d). The definition of a RICO "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The defendants jointly argue that the government failed to present sufficient evidence that the Wheels of Soul was an "enterprise" as defined by 18 U.S.C. § 1961(4) and thus assert that they could not be convicted of racketeering conspiracy under 18 U.S.C. § 1962(d). Specifically, the defendants claim that the evidence

-17-

presented at trial showed that the Wheels of Soul is a loosely organized national motorcycle club, but that each of its chapters had distinct rules and members with no real structure or control from the national leadership. They point to testimony from both Allan Hunter and a regional president in California which indicates that the Wheels of Soul regional presidents did not consult with the national office in Philadelphia prior to engaging in individual acts of criminal conduct and that the established national rules were not always followed by individual chapters.

We have previously explained that to prove the existence of a RICO enterprise the government must offer proof of (1) a common or shared purpose that animates the individuals associated with it, (2) a formal or informal organization of the participants in which they function as a unit, including some continuity of both structure and personnel, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. United States v. Kragness, 830 F.2d 842, 855 (8th Cir. 1987) (citing United States v. Turkette, 452 U.S. 576, 583 (1981); United States v. Bledsoe, 674 F.2d 647, 664–65 (8th Cir. 1982)). Evidence of a common purpose may "be circumstantial, as by evidence that the group of individuals functions as a continuing unit in an informal or formal organization engaged in a course of conduct directed toward the accomplishment of the common purpose alleged." United States v. Griffin, 660 F.2d 996, 1000 (4th Cir. 1981).

In United States v. Leisure, 844 F.2d 1347, 1363–64 (8th Cir. 1988), we addressed a challenge to the existence of a RICO enterprise, concluding that one existed where the organization "acted out of a common purpose to dominate local labor unions, profit economically from this domination, and murder opponents of their efforts to the extent necessary." We observed that the continuous and consistent nature of the association there, as well as the sequence of murders and attempted murders committed by members of the group, distinguished that organization from

one "of a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes." Id. (internal quotation omitted).

We conclude that there is sufficient evidence in the record before us to find that the Wheels of Soul was not a mere "sporadic" or "temporary" criminal alliance, but one that evidenced a sustained and continuous effort to maintain influence over certain territories and assert its dominance through a series of murders and attempted murders. Id.; see also United States v. Davidson, 122 F.3d 531, 534–35 (8th Cir. 1997). The government presented evidence that most of the victims of the violent acts described above were members of competing clubs, as in the shooting in Gary, the armed robbery against the Polks, and the conspiracy to murder members of Outcast. Moreover, there was evidence showing that these discrete disputes would "filter down" to other chapters. For example, after the "Black New Years" party on January 29, 2011, the national leadership indicated that the Wheels of Soul was "at war" with members of Outcast. Members were then encouraged at meetings to assert their dominance over these other groups and to use violence to achieve this end. Moreover, members like Walter Lee, who participated in the conspiracy to commit murder at the "Black New Year" event in St. Louis, testified that they committed certain acts for fear of discipline from the organization if they did not. Thus, there was sufficient evidence to find that each of these acts was tied to a common purpose communicated by the organization's leadership and was committed with the organization's encouragement, support, or coercion.

Moreover, the government presented evidence that the Wheels of Soul had an independent purpose as a motorcycle club. It had regular meetings, a constitution, dues, and formal officer positions that changed hands when necessary. Thus, the Wheels of Soul functioned as a unit with continuity of structure, and had an ascertainable purpose distinct from that inherent in the racketeering conduct. See Kragness, 830 F.2d at 855. We therefore conclude that the government presented

sufficient evidence for the jury to conclude that the Wheels of Soul was a RICO enterprise.

B.

The defendants next argue in their joint brief that the government failed to present sufficient evidence that the predicate acts committed by members of the Wheels of Soul amounted to a "pattern of racketeering" as required by 18 U.S.C. § 1962(c) and (d). Specifically, they argue that the predicate acts alleged by the government were unrelated, random, sporadic, spontaneous, and isolated acts motivated by personal feuds.

To demonstrate a "pattern of racketeering activity" the government must show "at least two acts of racketeering activity" which occurred within ten years of each other. 18 U.S.C. § 1961(5). Additionally, the government must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Criminal acts are related if they are shown to "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240; see also Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 769 (8th Cir. 1992). The acts must have both "horizontal relatedness," meaning that the acts are related to one another, and "vertical relatedness," meaning that the predicate acts have a nexus to the enterprise. United States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010).

We conclude that the government presented sufficient evidence for the jury to find a "pattern of racketeering activity." The government argued at trial that all of the predicate acts shared a similar purpose of asserting the dominance of the Wheels of Soul and punishing those who committed real or perceived transgressions against the

club or its members. For example, the government presented evidence that much of the violence was directed at individuals wearing "colors" that the Wheels of Soul had not authorized them to wear, including the incidents on August 10, 2009 and January 2, 2011. The government also presented evidence that several of these incidents occurred in defense of members or friends of the Wheels of Soul, such as the shooting at Bennigan's on May 28, 2009 and the shooting of an off duty corrections officer who was targeted for wearing a rival club's colors.

The incidents were also interrelated: disputes in one city would "trickle down" to other cities, and certain disputes would lead to declarations of "war" within the organization at large. The victims were almost always members of rival clubs, and the violent acts were almost always committed by members acting together during a group event, rather than a single individual acting alone. The jury was properly instructed that it must decide whether the acts were related. We conclude that it reasonable for the jury to find that the charged acts of violence arose from the motorcycle club's rivalries, loyalties, and desire to establish and maintain its continuing reputation. Cf. Burden, 600 F.3d at 218–19; United States v. Simmons, 923 F.2d 934, 951–52 (2d Cir. 2010).

Finally, there is no genuine dispute that the acts continued beyond the period of one year, and that the jury thus had sufficient evidence to conclude that the acts had continuity. See United States v. Hively, 437 F.3d 752, 761 (8th Cir. 2006). We conclude that the government presented sufficient evidence for the jury to find that the predicate acts committed by members of the Wheels of Soul amounted to a "pattern of racketeering."

C.

In his individual brief, national vice president Smith alleges that the district court erred in denying his motion for judgment of acquittal. He claims that no

reasonable jury could have found beyond a reasonable doubt that he was aware that any member of the conspiracy would commit two predicate acts of racketeering. The government can establish a conspiratorial agreement to violate RICO in two different ways: by proving either that a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant "agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise." United States v. Nguyen, 255 F.3d 1335, 1341 (11th Cir. 2001); see also Salinas v. United States, 522 U.S. 52, 63–65 (1997). The government did not charge vice president Smith with any substantive offenses, but rather relied on a knowledge and intent theory in convicting him of RICO conspiracy. Smith now challenges the sufficiency of the evidence intended to show that he knew about the acts taken by others to further or facilitate the criminal endeavor.

Seen in the light most favorable to the guilty verdict, we conclude there was sufficient evidence to convict Smith for conspiracy. While addressing a similar issue, the Eleventh Circuit explained that under the Salinas theory of RICO liability, "[t]he focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts." United States v. Starrett, 55 F.3d 1525, 1543–44 (11th Cir. 1995). The government can prove such an agreement with "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." Id. (internal quotation omitted).

During trial the jury heard the testimony of former members of the Wheels of Soul who testified that Smith was advised of numerous acts of violence committed by other members of the organization. Testimony indicated that Smith acknowledged these acts and did not attempt to take any corrective action. The government presented evidence that Smith also gave tacit approval to members who were

planning future retaliatory acts of violence. There was also evidence that Smith himself instructed members at national and regional meetings to use violence to promote the interests and standing of the organization. Taken together, this evidence is sufficient to prove his conspiratorial agreement.

D.

Henley raises several sufficiency of the evidence claims in his individual brief. First, he argues there was insufficient evidence to support his guilty verdict for RICO conspiracy because he was convicted of only one predicate offense. As explained above, however, the government does not have to show that Henley actually committed two predicate acts; it was sufficient to show that Henley knew about and agreed to facilitate the criminal scheme. Salinas, 522 U.S. at 64–65. The government introduced statements from Henley, the president of the St. Louis chapter, that the Wheels of Soul were "at war" with Sin City following the shooting at the Bennigan's in May 2009. The government also introduced evidence that defendant Henley held a St. Louis chapter meeting on August 10, at which he instructed members to assert their dominance over other motorcycle clubs in the city. Following the meeting, Henley directed members of his chapter to remove a couple's colors at gunpoint. There was thus sufficient evidence before the jury for it to find that Henley knew about and intended to facilitate the RICO scheme.

In addition, Henley argues that there was insufficient evidence to support his guilty verdict for conspiracy to commit murder because no jury could have found beyond a reasonable doubt that on the night of January 29, 2011 there was both an agreement to kill members of Outcast and an act in furtherance of such crime. Henley's central argument is that the primary evidence to convict him of conspiring to commit murder was the unreasonable and incredible testimony of Walter Lee. Our role is not to "assess the credibility of witnesses," however. United States v. Allery, 139 F.3d 609, 611 (8th Cir. 1998) (internal quotation omitted). It was the province

of the jury to weigh Lee's credibility and to examine his statements in light of the rest of the evidence presented at trial.

## E.

In their combined brief, Elkins and Fry raise a sufficiency of the evidence claim in response to their conviction for conspiracy to commit murder at the Black New Years party. This argument is again based on Walter Lee's lack of credibility. As already discussed above, however, we cannot assess the credibility of witnesses on appeal. Id. Moreover, the jury heard wiretap recordings and testimony from Allan Hunter which corroborated the participation of Elkins and Fry in the holiday scheme. We conclude there was sufficient evidence for the jury to convict on this charge.

## F.

Robinson raises three sufficiency of the evidence issues in his individual appeal. First, he argues that the district court erred in denying his motion for a judgment of acquittal, asserting that the government presented insufficient evidence for the jury to find beyond a reasonable doubt that he committed felony murder or attempted murder on January 2, 2011. This argument ignores the considerable evidence the government submitted that Robinson challenged a member of a rival motorcycle club with weapon drawn in an attempt to rob him of his colors. The government's evidence included not only testimony by the individual wearing the colors, but also by a friend who witnessed the event and by several bystanders. One of the bystanders even testified that she overheard an argument about a "rocker" shortly before the gun fight began. This record evidence is sufficient for a jury to find beyond a reasonable doubt that Robinson shot and killed a man at the clubhouse in the course of a robbery. Thus, Robinson's first argument fails.

Second, Robinson argues that the district court erred by denying his motion for a judgment of acquittal when the government failed to prove beyond a reasonable doubt that he was not acting in self defense when he shot at civilians at a party on March 6, 2011. This argument is likewise without merit. The jurors were specifically instructed on self defense before they deliberated, and they nevertheless convicted Robinson on one count of murder. Moreover, there was sufficient evidence for them to do so. Several witnesses stated that they had not see anyone else with guns at the time they saw Robinson shooting out the door of the clubhouse. The police report also indicates there was no physical evidence of shots having been fired at the building.

Third, Robinson argues that the district court erred in denying his motion for a judgment of acquittal after the government failed to prove beyond a reasonable doubt that he committed his RICO offenses for the purpose of maintaining or increasing his position in the Wheels of Soul. Other courts to address such issues have concluded that while the government must show that the defendant was motivated by maintaining or increasing his position in the racketeering enterprise, it need not show that it was his "sole or principal motive." United States v. Whitten, 610 F.3d 168, 178–79 (2d Cir. 2010) (internal quotation omitted). We agree. Here, the jury heard evidence that Robinson carried out, or was complicit in, various acts of violence directed at members of rival clubs. Moreover, the jury heard recorded statements in which Robinson said that he aimed to shoot people after they offended members of the club. There was sufficient evidence, when taken in the light most favorable to the verdict, for the jury to find that Robinson's offenses were acts of retaliation intended to further the interests of the organization and fulfill the requirements of his position as sergeant at arms.

G.

Peteet, like Henley, argues in his individual brief that there was insufficient evidence to support his conviction for RICO conspiracy because he was convicted of only one predicate offense. This argument ignores the applicable standard. As explained above, the government does not have to show that Peteet actually committed two predicate acts as long as it can show that Peteet knew about and agreed to facilitate the larger criminal scheme. Salinas, 522 U.S. at 64–65.

Viewed in the light most favorable to the verdict, there was sufficient evidence before the jury for it to conclude that Peteet knew about and intended to facilitate the RICO scheme. The jury heard evidence that Peteet was a chapter president, a position obtained only through the consent of the larger organization and which required communication with the regional and national leadership. Moreover, the government introduced evidence that Peteet shot Taylor, a member of a rival organization, while out with a group of Wheels of Soul members, and that this dispute "trickled down" to other chapters in the region. There was also evidence that Peteet was an attorney who occasionally represented or advised other members of the organization who faced legal action connected with their Wheels of Soul activity. While Peteet was not directly involved in multiple predicate acts, the jury heard sufficient evidence to find that Peteet knew about and agreed to facilitate the organization's larger criminal scheme. Id.

III.

The defendants next argue in their joint brief that the Eastern District of Missouri did not have jurisdiction to authorize the interception of communications from a cellular phone located in Illinois, and thus the district court erred when it denied their motions to suppress the evidence obtained from Allan Hunter's phone. We review the denial of a motion to suppress de novo and the underlying factual

-26-

determinations for clear error.  United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003).  While this issue was raised in the defendants' joint brief, we note that only defendants Henley, Smith, Elkins, and Robinson have preserved the issue and have standing to assert this claim.

Under 18 U.S.C. § 2518(3), a judge "may enter an ex parte order . . . authorizing or approving the interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting."  The defendants claim that the wiretap order failed to comply with this "jurisdiction requirement" because the target phone of the wiretap order was based in Chicago during the entire course of the government's investigation, a city outside the "territorial jurisdiction" of the Eastern District of Missouri.

While this is an issue of first impression in our circuit, similar arguments have been consistently rejected in other circuits.  In United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992), for example, the Second Circuit concluded that "for purposes of § 2518(3)'s jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard."  That court focused on the plain language of 18 U.S.C. § 2510(4), which defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  968 F.2d at 136.  It reasoned that the reference to "aural" acquisition necessarily encompasses the place where the redirected contents of the communication are first heard.  Id.  The Fifth Circuit agreed with this reasoning in United States v. Denman, 100 F.3d 399, 403 (5th Cir. 1996), concluding "that interception includes both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders."  See also United States v. Luong, 471 F.3d 1107, 1109 (9th Cir. 2006).

We agree with this interpretation of § 2518(3) as applied to the facts of this case. While the investigation of the Wheels of Soul ultimately encompassed a wide region, it originated in St. Louis. Several of the original targets of the investigation lived in St. Louis and several of the charged substantive offenses occurred in St. Louis. The listening post was established in St. Louis as part of this larger government investigation and the contents of the intercepted communications were first heard there. On this record we conclude that a judge sitting in the Eastern District of Missouri had jurisdiction to authorize this wiretap, see Rodriguez, 968 F.2d at 136, and that defendants' motion to suppress was properly denied.

IV.

The defendants jointly challenge the admission of their recorded conversations—those recorded with the consent of informant Matthew Hunter and those recorded under the Title III wiretap of Allan Hunter's phone. The defendants first argue that the government failed properly to authenticate Matthew Hunter's consensual tape recordings and the Title III wiretap recordings from Allan Hunter's cellular phone. They point out that one of the witnesses who was asked to authenticate the recordings at trial admitted on cross examination that he had not reviewed all of the recordings before testifying. They also allege that several of the witnesses authenticating the recordings had trouble identifying the time at which the original conversations had occurred. Additionally, they assert that the recordings introduced at trial, which were copies of the original recordings, had never been directly compared to the originals. Nor was any evidence presented on steps taken to maintain the integrity of these copies. Defendants claim therefore that chain of custody was not properly established and that the government erred by introducing no affirmative evidence to show the tapes had not been tampered with or altered after they were sealed. Finally, the defendants argue that the recordings are poor with numerous gaps and therefore are untrustworthy evidence. They also argue that the wiretap recordings were never properly sealed.

-28-

Our review is for clear abuse of discretion. United States v. Roach, 28 F.3d 729, 732–33 (8th Cir. 1994). Admission of electronic tape recordings is likely proper where the government established that: (1) the recording device was capable of recording the events offered in evidence, (2) the operator was competent to operate the device, (3) the recording is authentic and correct, (4) changes, additions, or deletions have not been made in the recording, (5) the recording has been preserved in a manner that is shown to the court, (6) the speakers on the tape are identified, and (7) the conversation elicited was made voluntarily and in good faith, without any kind of inducement. Id. at 733 (citing United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1974)). We have explained that these McMillan factors are merely helpful guidelines, and must be "viewed in light of [the] specific circumstances," rather than rigidly applied. United States v. Oslund, 453 F.3d 1048, 1055 (8th Cir. 2006).

While the trial court did admonish the government for "leaving the impression with me and with the members of this jury that [a] witness had listened to these recordings before he heard them in court for the first time," the district court ultimately denied the defendants' motion to strike on this ground, stating that "there is a sufficient foundation, or [there] will be . . . before this case is over." The government later called officer Van Mierlo who testified about the technology used to record the conversations and the process used to collect and to review these recordings. She also disclosed the steps taken to prepare the recordings for trial. At the end of this testimony the district court concluded "that the Government has laid the appropriate foundation for all of these recordings, and so . . . den[ied] the objections to the playing of these recordings and the transcripts based on all the arguments that you all have made here and throughout the trial." It explained that while "the Government did not lay the proper foundation in the beginning, . . . it has now been laid."

While the government may have made some mistakes while authenticating the voluminous recordings at trial, the district court did not clearly abuse its discretion

-29-

in admitting the evidence. First, the government introduced a witness who participated in each recorded conversation presented at trial, and the defendants challenge only one of these witnesses for having failed to review all of the tapes prior to trial. Roach, 28 F.3d at 733 (recordings are properly authenticated where participants in the recorded conversation affirm the recording's accuracy after listening to that recording). Moreover, the challenged witness did testify that he had reviewed transcripts of the conversations and that these transcripts accurately reported the conversation in which he had participated. The court did not abuse its discretion in examining the evidence of authenticity as a whole and concluding that the McMillan factors were satisfied here.

As to the chain of custody and preservation challenges, we again conclude that the district court did not clearly abuse its discretion in admitting the evidence. We have previously explained that a district court "is entitled, absent proof to the contrary, to assume that the investigators properly maintained [a] tape and did not tamper with it." Roach, 28 F.3d at 733; see also United States v. Coohey, 11 F.3d 97, 100 (8th Cir. 1993). Moreover, officer Van Mierlo presented significant testimony about the procedures used to collect, store, and prepare the recordings for trial. This testimony included explanations of the security features on the server where the wiretap recordings were stored and the reasonable steps taken to protect these recordings "from editing or other alterations." 18 U.S.C. § 2518(8)(a). Any concerns about the "gaps" in the recordings go to weight of the evidence, and not its admissibility. Oslund, 453 F.3d at 1056 (internal quotation omitted).

A remaining issue is whether the recordings were improperly sealed. Under 18 U.S.C. § 2518(8)(a), recordings obtained through a Title III wiretap must be sealed "[i]mmediately upon the expiration of the period of the order." The defendants argue that the recordings here were not sealed until six days after the expiration of the last of three different orders. They also argue that in violation of Title III, the recordings made under the first wiretap order were not sealed until 60 days after the expiration

of that order. This argument is contradicted by the language of the statute, which reads in full that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." § 2518(8)(a) (emphasis added). The wiretap expired at 11:59 p.m. on a Friday, and Officer Van Mierlo contacted the court that Monday for an appointment to seal the recordings. The busy presiding judge then was able to find time on Thursday to seal the recordings. We conclude on these facts that the delay caused by the judge's schedule was excusable. See United States v. Pedroni, 958 F.2d 262, 266 (9th Cir. 1992).

The district court thus did not err in admitting the recorded evidence.

V.

Appellants collectively (and Smith, Fry, and Elkins individually) argue that the district court abused its discretion by not submitting the case with a special verdict form requiring that the jury unanimously find which predicate acts were attributable to any one of the defendants. Our standard of review is for an abuse of discretion. United States v. Pierce, 479 F.3d 546, 551 (8th Cir. 2007). Special verdict forms may be confusing for a jury and their use is within the discretion of the court. Id. As the Second Circuit has explained, the "ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge and [] neither the prosecutor nor the defendant has the right to insist on their use." United States v. Applins, 637 F.3d 59, 83 (2d Cir. 2011) (quoting Robert M. Grass, Note, Bifurcated Jury Deliberations in Criminal RICO Trials, 57 FORDHAM L. REV. 745, 754 (1989)).

VI.

Robinson argues for reversal of his attempted murder conviction resulting from the January 2, 2011 shooting at the Chicago clubhouse. He argues that the jury was

improperly instructed on the elements of the offense, resulting in a "constructive amendment" of the superseding indictment. Robinson states that the court's Instruction 40 failed to make clear that the jury had to find beyond a reasonable doubt that he had taken a substantial step toward committing the crime of first degree murder, an essential element of attempted murder alleged in the superceding indictment. Since Robinson did not object to this instruction at trial, we review for plain error, reversing only if the error was so prejudicial as to have affected the defendant's substantial rights. United States v. Gavin, 583 F.3d 542, 545–46 (8th Cir. 2009).

While the "substantial step" language should have been included in Instruction 40, we conclude that the omission did not affect Robinson's substantial rights. We must examine the entire jury charge read as a whole in order to determine if it "fairly and adequately contains the law applicable to the case." United States v. Webster, 442 F.3d 1065, 1067 (8th Cir. 2006) (internal quotation and citation omitted). Here, the jury was twice instructed that a "substantial step" is a required element to convict a defendant for attempt. Instruction 28(F) stated that "[a] person commits the crime of Attempt to Commit Murder in violation of Illinois law, when he . . . voluntarily and intentionally carries out some act which is a substantial step toward that crime," and Instruction 47 provided a definition both of "attempt" and of "substantial step." Taken as a whole, the instructions sufficiently explained the "substantial step" requirement to the jury.

VII.

Robinson also alleges in his individual brief that the district court abused its discretion when it permitted the government to introduce evidence of the November 1, 2009 murder of an off duty corrections officer, an uncharged murder not included among the "overt acts" listed in the superceding indictment. We review for clear abuse of discretion the district court's evidentiary rulings, "reversing only when an

-32-

improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." United States v. Summage, 575 F.3d 864, 877 (8th Cir. 2009).

The district court did not abuse its discretion in admitting this evidence. In a similar challenge in the Eleventh Circuit, that court concluded that evidence of uncharged crimes was admissible in a RICO prosecution as "proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." United States v. Gonzalez, 921 F.2d 1530, 1546–47 (11th Cir. 1991); see also United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003). Evidence of uncharged predicate acts of murder can be relevant to establish the elements of a RICO conspiracy. See United States v. Finestone, 816 F.2d 583, 586–87 (11th Cir. 1987). Here, the testimony of Allan Hunter about the November 1, 2009 murder of a corrections officer was relevant to establish both the continuity of the conspiracy and the common purpose underlying Robinson's acts. In the context of the other acts charged in the indictment, we conclude the evidence was not unfairly prejudicial.

## VIII.

Smith argues in his individual brief that his motion to sever should have been granted because the complexity of the case made it impossible for the jury to compartmentalize the evidence. We will reverse a district court's denial of a motion to sever only if "clear prejudice and an abuse of discretion is shown." United States v. Mueller, 661 F.3d 338, 347 (8th Cir. 2011) (internal quotation omitted). Smith has not shown either here.

We have previously recognized that "persons charged with conspiracy should generally be tried together." United States v. Kindle, 925 F.2d 272, 277 (8th Cir. 1991). There is a strong presumption for a joint trial since it "gives the jury the best

perspective on all of the evidence and therefore increases the likelihood of a just outcome." United States v. Lewis, 557 F.3d 601, 609 (8th Cir. 2009) (internal quotation omitted). In assessing the jury's ability to compartmentalize the evidence against joint defendants, not only the complexity of the case must be examined, but also whether any of the defendants were acquitted and whether the jury instructions were adequate. Id. at 610. Here, the jury acquitted four of the six defendants on charged offenses and it was specifically instructed to evaluate the evidence against each defendant separately. Smith has not shown on this record that the court erred by failing to sever his case.

IX.

Defendant Peteet argues in his individual brief that the district court abused its discretion by refusing to admit an affidavit, purportedly by Barry Rogers, which claimed that it was he who had shot Taylor at the Bennigan's parking lot on May 28, 2009. The hearsay confession of an unavailable third party to exculpate someone else is admissible only if it can satisfy at least two criteria. These criteria are: (1) the statement must have "so far tended to subject [the declarant] to civil or criminal liability" that a reasonable person would not have made such an admission, and (2) there must exist "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." Fed. R. Evid. 804(b)(3) advisory committee's note. The Rogers affidavit was not clearly against his own interest because in it he claims he shot Taylor in self defense. See United States v. Shryock, 342 F.3d 948, 981 (9th Cir. 2003) ("The district court did not abuse its discretion by excluding [the unavailable declarant's] statement that he shot the victims in self-defense because the statement was exculpatory, and not against his penal interest.").

While Peteet argues that Rogers opened himself to prosecution for being a felon in possession by his affidavit, it was still inadmissible if it lacked indicia of trustworthiness. Fed. R. Evid. 804(b)(3). As a fellow member of the Wheels of Soul,

-34-

an organization based around loyalty to its members, Rogers had a motive to help Peteet. Moreover, numerous other witnesses testified that Peteet was the shooter. Only Peteet and his brother presented testimony that it had been Rogers. We conclude the district court did not clearly abuse its discretion in finding the affidavit unreliable and inadmissible.

## X.

Defendant Peteet also argues in his individual brief that the district court erred by excluding the testimony of Rogers' wife as to certain statements made by him about the events of May 28, 2009. This argument is without merit. When Peteet called Rogers' wife to the stand at trial, the government objected on hearsay grounds before she could testify as to what her husband had said when he returned home on the evening of May 28. The government's objection was sustained, and this issue was not preserved because Peteet did not make an offer of proof on the excluded evidence. United States v. Yarrington, 634 F.3d 440, 447 (8th Cir. 2011) (citing Fed. R. Evid. 103(a)(2)). It is therefore reviewed only for plain error. Id. An offer of proof is provided "to inform the court and opposing counsel of the substance of the excluded evidence and to provide the appellate court with a record sufficient to allow it to determine if the exclusion was erroneous." Id. (internal quotation omitted). We conclude that the district court did not plainly err in excluding the testimony of Rogers' wife since Peteet failed to lay an evidentiary foundation by showing it to be an excited utterance or a statement against interest.

## XI.

Finally, Peteet argues in his individual brief that the district court erred at his sentencing by imposing a two level enhancement under U.S.S.G. § 3B1.1(c) as "an organizer, leader, manager, or supervisor." A district court's factual findings supporting a leadership enhancement are reviewed for clear error and its legal

conclusions are reviewed de novo. United States v. Adetiloye, 716 F.3d 1030, 1037 (8th Cir. 2013). In determining whether an enhancement under § 3B1.1 is appropriate, we examine such factors as "[t]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the nature and scope of the illegal activity, and the degree of control and authority exercised over others." United States v. Frausto, 636 F.3d 992, 996 (8th Cir. 2011) (citing United States v. Adamson, 608 F.3d 1049, 1056 (8th Cir. 2010)).

There was sufficient record evidence for the district court to find that Peteet was eligible for a two level leadership enhancement. Peteet's colors were introduced in evidence, and they bear a "president" patch. There was also evidence that chapter presidents were responsible for maintaining membership, ensuring the payment of dues, calling and presiding over meetings where priorities were communicated, passing information from the national and regional leadership to the members, and enforcing club rules. In addition, the jury heard that Peteet stored and reissued "colors" for other members of his chapter who were imprisoned. He also directed members to conceal the weapon used in the May 28, 2009 Bennigan's shooting and later to produce the gun after he was indicted. We conclude that the evidence supported the district court's application of the leadership enhancement.

## XII.

After thoroughly reviewing the extensive record in this case and the legal arguments raised, we affirm the judgments of the district court.

_____